EL ESTADO LIBRE ASOCIADO DE PUERTO RICO, demandante y apelante, *v.* JORGE I. ROSSO y su esposa CARMEN DESCARTES, demandados y apelados.

*Número:* AP-65-48        *Resuelto:* 7 de diciembre de 1967

502

*J. B. Fernández Badillo, Procurador General,* e *Irene Curbelo, Procuradora General Auxiliar,* abogados del apelante; *V. M. Sánchez Fernández, Jaime García Blanco, Yamil Galib Frangie* y *Enrique Córdova Díaz,* abogados de los apelados.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión
del Tribunal.

En 5 de diciembre de 1963 el Estado Libre Asociado de
Puerto Rico interpuso demanda de expropiación forzosa para
uso y beneficio de la Administración de Terrenos, una agen-
cia gubernamental del Estado Libre Asociado creada por la
Ley Núm. 13 de 16 de mayo de 1962. La demanda de expro-
piación, dirigida contra bienes propiedad de los demandados
apelados, se interpuso en virtud de la autoridad que confiere
esa Ley, y la Ley general de Expropiación Forzosa vigente.

Se hizo constar en la demanda que el Director Ejecutivo
de la Administración de Terrenos estimaba útil, necesario y
conveniente para llevar a cabo los fines y propósitos para los
cuales se creó la Administración, el adquirir las propiedades
objeto de la misma y específicamente, a los fines de destinar-
las a la habilitación y uso eficiente de nuevas áreas para las
necesidades de la comunidad, creando reservas adecuadas de
terreno para ayudar al Estado Libre Asociado de Puerto
Rico a realizar su política pública, así como para cualesquiera
otros propósitos encaminados a lograr los propósitos de la
Ley que creó la Administración de Terrenos; y que la adqui-
sición de las propiedades objeto de la acción es de necesidad
y utilidad públicas y cumple los fines de la Administración.
Se expropió el dominio absoluto de dos fincas de 137.70 y
118.26 cuerdas, de otra de 25.519, y de 62.8528 cuerdas for-
madas por agrupación de cuatro parcelas menores, con sus
respectivas estructuras y accesiones.

Conjuntamente con la demanda se radicó declaración para
la adquisición y entrega inmediata de la propiedad, firmada
por el Gobernador de Puerto Rico, en que se hizo constar que
las propiedades se adquirían por el Estado Libre Asociado
para uso y beneficio de la Administración de Terrenos a los
fines de que lleve a cabo los propósitos para los cuales fue
creada y específicamente, para la habilitación y uso eficiente
de nuevas áreas para las necesidades de la comunidad del

área metropolitana de San Juan y encauzar proyectos de la Administración conformes con agencias estatales o federales, con el gobierno municipal o con particulares; y para crear reservas adecuadas de terreno para ayudar al Estado Libre Asociado a realizar su política pública y para la realización de cualesquiera programas encaminados a lograr los propósitos de la Ley Núm. 13 de 16 de mayo de 1962 creadora de la Administración. Se depositó en el tribunal como justa y razonable compensación por la propiedad adquirida la cantidad de $1,381,676.00.

Por resolución de 5 de diciembre de 1963, conforme a ley, el título de dominio pleno quedó investido en el Pueblo de Puerto Rico y se concedió a los demandados un término de 30 días para la entrega de los bienes. Después de varios incidentes, por resolución de 24 de febrero de 1964 el tribunal suspendió la orden de entrega material de la propiedad hasta que el caso de expropiación se resolviera en sus méritos. La situación desde entonces al presente es que el Pueblo de Puerto Rico ha ostentado el título dominical de los bienes desde el día 5 de diciembre de 1963 pero aún no ha entrado en la posesión, uso y disfrute de los mismos. [1]

---

[1] Con motivo de los incidentes relacionados con la entrega material de la propiedad el Estado Libre Asociado hizo constar lo siguiente en autos: "Ni la solicitud del Gobierno ni la Orden de este Tribunal investiendo el título en el Estado iban encaminadas a paralizar todas las operaciones de los demandados en los terrenos expropiádoles, y mucho menos a causar la cesantía de empleado alguno de los demandados, al punto de que el Estado ha hecho la oferta clara y específica de pagar las mejoras que legalmente pudiera realizar el demandado en tanto entrega finalmente la propiedad." Acorde con lo anterior el Gobierno solicitó que se autorizara a los demandados, "en tanto el Tribunal resuelve sobre la antedicha moción, [de entrega] a seguir operando los negocios que actualmente explotan en los terrenos expropiados"; y que se les autorizara "a llevar a cabo en la propiedad trabajos que conlleven mejoras útiles a la misma y que no entorpezcan el futuro uso de dicha propiedad por la Autoridad de Terrenos, mejoras por las cuales el Estado abonará su justo precio." (Comparecencia de 24 de diciembre de 1963.) Por resolución de igual fecha el tribunal dispuso conforme a lo anteriormente expuesto.

Por sentencia de 2 de julio de 1964 el tribunal declaró sin lugar la demanda de expropiación y dejó sin efecto la resolución de 5 de diciembre de 1963 de investidura de título. El Estado Libre Asociado interpuso el presente recurso de apelación.

—II—

Sirvieron de base a los anteriores procedimientos los siguientes hechos:

El 29 de agosto de 1962 la Administración de Terrenos sometió a la consideración de la Junta de Planificación, conforme a las disposiciones de la Ley de su creación, un proyecto de desarrollo integral del área metropolitana de San Juan, y solicitó que la Junta aprobara dicho proyecto de adquisición de terrenos (Ámbito del Proyecto) según plano que se acompañaba. Expuso que en el área geográfica indicada la Administración se proponía realizar obras de carácter público o llevar a cabo otros programas afines con la Ley de Administración de Terrenos y, como proyecto integral, habilitar nuevas áreas para el desarrollo urbano del Área Metropolitana en condiciones que aseguraran el mejor equilibrio en cuanto a las necesidades de las futuras comunidades del área, tomando en consideración las normas de la Ley, especialmente su Art. 7(t), para asegurar en dicha área las mejores condiciones de salubridad, seguridad, comodidad, facilidades recreativas y otros servicios esenciales. Todo ello estaba proyectado de manera que pudieran encauzarse los proyectos de desarrollo en esta zona de manera que los mismos propiciaran la utilización de los terrenos indicados en el plano en una forma planificada y eficiente. Como fundamentos básicos de la anterior petición a la Junta, la Administración de Terrenos sometió la información y los datos contenidos en su consulta. Por tener fundamental importancia en la consideración de la cuestión litigiosa, se unen el documento y plano como Anexo (A) de esta opinión.

La Junta de Planificación aprobó el Ámbito del Proyecto sometido por la Administración. (²)

Al así hacerlo, expresó la Junta que consciente de sus responsabilidades de ley ejerciéndolas con el propósito gene-

(²) En su aprobación, la Junta estableció los siguientes hechos:

1. El extraordinario crecimiento económico del Área Metropolitana de San Juan en la década de 1950 a 1960 se reflejó dramáticamente en el ritmo de construcción de viviendas, que aumentó de aproximadamente 2000 unidades anuales a principios de la década a 7,600 en 1960. En 1961 se construyeron 6,400 y en 1962, 8,700 viviendas.

2. De 1950 a 1960 se construyeron en el Área Metropolitana unas 38,000 viviendas privadas, un 70% de todo el país. En 1960 habían 148,000 viviendas comparadas con 108,000 en 1950. Además la Corporación de Renovación Urbana construyó durante la década unas 7,548 unidades de vivienda pública y desarrolló 2,370 solares.

3. En adición se requirieron en el Área Metropolitana otras 3,000 cuerdas para proyectos industriales, comerciales, carreteras y otras vías de comunicación. Algunas de estas instalaciones necesitan ya su ampliación o de instalaciones adicionales, por su falta de capacidad.

4. En la pasada década el Área Metropolitana de San Juan absorbió todo el crecimiento poblacional que tuvo Puerto Rico. De una población de 509,000 que tenía en 1950 aumentó a 648,000 en 1960, a pesar de que en el período la emigración fue sustancial. Anticipando un crecimiento regional equilibrado, se concluye que el Área Metropolitana crecerá probablemente de 648,000 en 1960 a 863,000 en 1970 y a 1,112,000 en 1980.

5. El crecimiento demográfico va acompañado del crecimiento económico y del aumento en el ingreso familiar. Se espera que el número de empleos en el Área Metropolitana aumente de 140,000 en 1950 a 180,000 en 1960, a 254,000 en 1970 y a 326,000 en 1980.

6. El aumento de empleos habrá de registrarse en industrias de alta remuneración que utilizan mano de obra especializada, principalmente en ocupaciones profesionales, técnicas, oficinescas, de mayor retribución. Del incremento total de empleos previsto para la próxima década, el 65% será en la industria manufacturera y el 33% en el gobierno, actividades éstas de empleos calificados.

7. El efecto de este crecimiento de empleos en el ingreso de familia señala hacia un aumento de 80,000 en el número de familias con ingreso de poder adquisitivo de $3,000 en la década de 1960 a 1970. Se estima que habían 50,000 familias en 1960 con ingresos de más de $3,000. En 1970, se estima que este número de familias con poder adquisitivo para comprar casas similares podrá ser de 130,000, o un aumento de 80,000. El estimado para 1980 es de 206,000 de estas familias. Muchas de estas familias son jóvenes con ocupaciones más especializadas, que habrán de ir entrando en el mercado de viviendas por desear un hogar propio. El número de hogares en el Área Metropolitana encabezado por hombres de 20 a 25 años, gente joven, era de 20,800 en 1960. En 1970 se espera que

ral de guiar el desarrollo de Puerto Rico de modo coordinado, adecuado y económico, el cual, de acuerdo con las actuales y futuras necesidades y los recursos humanos, físicos y económicos, hubiere de fomentar en la mejor forma la salud, la

este número sea de 42,000 y para 1980, de 47,000. Esto implica un crecimiento en la demanda de hogares nuevos.

8. Se calcula que el número de viviendas ocupadas en el Área Metropolitana subirá de 140,000 a 201,000 entre 1960 y 1970, y a 274,000 para 1980.

9. Existen además otras viviendas que por cuestión de movilidad u otras razones pueden estar desocupadas. En 1950 el número de viviendas desocupadas fue de 5% de las ocupadas. En 1960 era el 6% y se estima que puede subir al 7 u 8%, respectivamente, para el 1970 y 1980. Considerando las viviendas ocupadas y desocupadas, el número en el Área Metropolitana para 1980 se anticipa que sea de 296,000 viviendas. Se indica para el 1970, 70,000 viviendas más que en 1960.

10. Considerando el incremento demográfico y el crecimiento económico y de empleo, y del ingreso familiar, se indica que en el Área Metropolitana será necesario construir 80,000 viviendas privadas del tipo del mercado actual, y entre 1970 y 1980 habrán de requerirse unas 90,000 adicionales. En los 3 años de 1960 a 1962 se construyeron 22,700 viviendas privadas, de las cuales 8,700 fueron del último año.

11. Un estudio de las urbanizaciones construidas en el Área Metropolitana en la década anterior refleja una densidad promedio de 6 viviendas por cuerda. Considerando las guías adoptadas por la Junta, se estima que la densidad promedio ascienda a 8 viviendas por cuerda. En consecuencia, las 170,000 viviendas que se requiere construir para 1980 necesitarán unas 20,7000 cuerdas.

12. Para alcanzar el objetivo de vivienda pública para el 1970—familias residentes en áreas a mejorarse—será necesario construir alrededor de 16,000 unidades de vivienda pública y desarrollar unos 12,000 solares. Igual número sería necesario proveer entre 1970 y 1980. Este total de unidades de viviendas y solares requerirá 4,000 cuerdas.

13. Para 1970 se estima un nivel de 44,000 empleos en la manufactura, lo que implica un aumento de 17,000 empleos. Entre 1970 y 1980 se espera igual aumento de 17,000. El total de este aumento requerirá alrededor de 850 cuerdas.

14. Para atender la demanda aumentada de servicios y utilidades públicas que produce el crecimiento poblacional y económico anticipado, se necesitará disponer de otras 3,170 cuerdas para construir carreteras, hoteles, instalaciones comerciales, parques, hospitales, oficinas gubernamentales y otros servicios.

15. En consecuencia de todo lo anterior se calcula que en el Área Metropolitana se necesitarán hasta 1980 alrededor de 28,720 cuerdas. De esta cantidad se estima que 3,000 cuerdas se desarrollaron entre 1960 y 1962. Esta área remanente de 25,720 cuerdas constituye el terreno vacante

seguridad, la moral, el orden, la conveniencia, la prosperidad, la defensa, la cultura, la solidez económica y el bienestar general de los actuales y futuros habitantes, y aquella eficiencia y economía en el proceso de desarrollo, en la distribución de población, en el uso de las tierras y de las mejoras públicas que tiendan a crear condiciones favorables a tales fines, consideraba imprescindible la "implementación" de un programa de desarrollo para el Área Metropolitana de San Juan. El programa se basará en la demanda de terrenos que el crecimiento poblacional y económico indicado anteriormente requerirá en el Área Metropolitana de San Juan, lo que permitirá a la Junta de Planificación encauzar el crecimiento de dicha área asegurando un desarrollo compacto y contiguo a las áreas ya construidas, adecuadamente provistas de facilidades y servicios de comunidad. Así, la Junta concurrió con la Administración y procedió a aprobar el Ámbito del Proyecto de desarrollo que ésta le sometiera, según plano unido al Anexo (A). En consecuencia, la Junta autorizó a la Administración de Terrenos a adquirir por compra, expropiación o de cualquier otra forma los terrenos vacantes urbanizables comprendidos dentro del Ámbito del Proyecto de su desarrollo urbano, para habilitar los terrenos necesarios para el normal y compacto desarrollo de esta área.

---

urbanizable en el Área Metropolitana comprendido en el Ámbito del Proyecto sometido por la Administración de Terrenos.

16. Durante la década de 1950 a 1960 se urbanizaron 10,000 cuerdas que correspondieron en su mayoría a viviendas privadas y a proyectos públicos. Los datos anteriores señalan un promedio de 14,000 cuerdas a urbanizarse en cada una de las décadas de 1960 a 1970 y de 1970 a 1980.

17. A octubre de 1962 estaban en uso alrededor de 39,350 cuerdas en el Área Metropolitana. Incluye 3,900 cuerdas de proyectos residenciales privados en proceso de construcción o con planos o desarrollo preliminar aprobados.(*)

---

(*)*Nota:* Los datos y estimados expuestos en los 17 anteriores párrafos se refieren única y exclusivamente al Área Metropolitana de San Juan. Comprende los Municipios de San Juan, Bayamón, Cataño, Guaynabo, Trujillo Alto y Carolina.

La aprobación ocurrió en 23 de enero de 1963. Fue disposición de la Junta lo siguiente: "[e]l derecho de usar cualquier propiedad de las comprendidas dentro del ámbito de este proyecto de conformidad con los usos autorizados por los vigentes reglamentos y órdenes de esta Junta, queda inalterado mientras no se instituya formalmente la acción de adquisición en cualquier forma legal de dicha propiedad en particular."

El 24 de enero de 1963 la Junta de Gobierno de la Administración de Terrenos, presidida por el Gobernador, aprobó su Resolución Núm. 5.([3]) Aceptó en ella el Ámbito del Proyecto de desarrollo aprobado por la Junta de Planificación (plano, Anexo (A)). Declaró que la propiedad descrita en el Ámbito del Proyecto era útil, necesaria y conveniente para llevar a cabo los fines de la Administración y para realizar los propósitos de la Ley; autorizó la adquisición por compra, expropiación o de otra forma, bajo términos y condiciones satisfactorios a la Administración, de dicha propiedad; y autorizó al Director Ejecutivo de la Administración para firmar y otorgar cuantos documentos fueren necesarios para adquirir por compra, expropiación o de cualquier otro modo, esas propiedades dentro del Ámbito del Proyecto.

En reunión anterior de 10 de julio de 1962 la Junta de Gobierno adoptó la siguiente norma: que no adquiriría terrenos con desarrollo preliminar de buena fe, aprobados o bajo estudio de la Junta de Planificación a la fecha en que se radicó en la Asamblea Legislativa el proyecto que se con-

---

([3]) La Ley Núm. 13 dispuso que el gobierno y los poderes de la Administración, y su política general, se ejercerán por una Junta de Gobierno presidida por el Gobernador; el Presidente de la Junta de Planificación como su Vicepresidente, y los Secretarios de Hacienda, de Obras Públicas y de Agricultura; el Director de la Corporación de Renovación Urbana y Vivienda, el Administrador de Fomento Económico y dos ciudadanos nombrados con el consejo y consentimiento del Senado. Podrá observarse que en la composición de la Junta se reunieron los criterios de las diversas agencias y organismos gubernamentales a quienes competía hacer determinaciones relacionadas con los propósitos de la Ley.

virtió en la Ley creando la Administración de Terrenos. Que la buena fe se podría demostrar con actos que evidenciaran la intención de llevar a cabo inmediatamente o en un futuro inmediato determinado el desarrollo aprobado. *Prima facie* no se consideraría desarrollo de buena fe aquel presentado a la Junta de Planificación después de aprobado la Ley de la Administración.

Sujeto a la anterior norma, en la reunión de la Junta de Gobierno de 24 de enero de 1963 se autorizó la adquisición de un sinnúmero de fincas pertenecientes a distintos dueños, entre ellas, las de los demandados Sres. Rosso aquí en litigio.[4] Hizo constar el Sr. García Santiago, Presidente de la Junta de Planificación, que ante dicha Junta no existía proyecto alguno de urbanización respecto a las fincas del Sr. Rosso. Tampoco existía propuesta alguna.

Desde febrero de 1961 la Junta de Planificación suspendió la aprobación en general de proyectos de urbanización en el Área Metropolitana de San Juan hasta que se adoptaran nuevas guías. Las guías se promulgaron por la Ley Núm. 25 de 8 de junio de 1962. Al presentarse en las Cámaras Legislativas el proyecto creando la Administración en 23 de abril de 1962, y cuando éste se convirtió en la Ley Núm. 13 en mayo 16, dicha suspensión estaba en vigor.

En reunión de 1ro. de mayo de 1963 la Junta de Gobierno consideró una reconsideración de su acuerdo solicitada por el Sr. Rosso, la cual fue denegada, ratificándose el acuerdo original de adquirir sus propiedades. En esta ocasión, al igual que en la reunión anterior el Sr. García Santiago expuso que se debían adquirir las fincas del demandado porque formaban parte de un área contigua, no se podían desarrollar indepen-

---

[4] En adición a las 344.3318 cuerdas del Sr. Rosso, en esa reunión se autorizó la adquisición de otras 585.05 cuerdas propiedad de distintas personas. En reuniones siguientes la Junta de Gobierno autorizó la adquisición de propiedades en el Ámbito del Proyecto de desarrollo de la ciudad de Arecibo, del ámbito de la zona metropolitana de Mayagüez y del área metropolitana de Ponce, y fincas adicionales del área de San Juan.

dientemente del área que las circunda, y con su adquisición se integraría el área de modo de lograr una planificación ordenada y viviendas a bajo costo. [5]

Sirvieron de base, además, a los anteriores procedimientos de expropiación, los siguientes hechos adicionales:

El 16 de mayo de 1962 la Asamblea Legislativa aprobó la Ley Núm. 13 que dio vida a la Administración de Terrenos de Puerto Rico como un cuerpo político e instrumentalidad gubernamental. Los fundamentos para esta legislación se expresan en una amplia exposición de motivos en donde la Asamblea Legislativa declara la existencia de los siguientes hechos:

(1) Que el Estado Libre Asociado de Puerto Rico es una de las áreas de mayor densidad poblacional en el mundo.

(2) Que terrenos urbanos o con potencialidades para desarrollo urbano son acaparados y dejados sin uso por sus dueños.

(3) Que esto crea una escasez artificial de tierra y aumento en precio de los terrenos a un ritmo mayor que el aumento de precio de otros bienes y artículos de primera necesidad.

(4) Que el rápido aumento en el precio de terrenos imposibilita que las personas de escasos o medianos recursos compren terrenos en áreas adecuadas y obliga a estas personas a construir sus hogares fuera de las áreas inmediatas a las poblaciones y lejos de sus lugares de trabajo y sitios donde llevan a cabo sus demás actividades.

---

[5] En la contestación a interrogatorios sometidos por los demandados apelados (Exh. B de los demandados) se explican las anteriores conclusiones. Se explica el desarrollo ordenado e integrado y económico de un área de aproximadamente 600 cuerdas de las cuales las del aquí demandado apelado sólo eran parte, y se dice que las fincas del demandado y las otras expropiadas constituyen un área vacante (bolsillo) entre las áreas construidas de Guaynabo y Bayamón, siendo socialmente necesario y urgente que dicha área se desarrolle en forma equilibrada tomando en cuenta las necesidades de la comunidad independientemente de los factores de costos y ganancias.

(5) Que el aumento en los precios de los terrenos crea expansiones urbanas indeseables, lo cual, a su vez, crea serios problemas financieros al Estado Libre Asociado y a los gobiernos municipales por razón de que los costos de proveer los servicios públicos tales como carreteras, agua, alcantarillado, parques públicos, salud pública, prevención y extinción de fuegos, vigilancia policiaca y otras actividades de protección de vida y propiedad, esenciales para el desarrollo de la comunidad, aumentan varias veces.

(6) Que el aumento en los precios de los terrenos aumenta el costo fijo de las empresas industriales y comerciales y, en consecuencia, sus productos quedan en desventaja en la competencia en el comercio, tanto local como fuera de Puerto Rico.

(7) Que el relativamente rápido aumento en el precio de los terrenos aumenta las desigualdades en los ingresos porque las tierras sin uso en Puerto Rico, tanto urbanas como rurales, están controladas en gran parte por un pequeño número de personas.

(8) Que el aumento en el precio de los terrenos afecta además, o impide, la "implementación" de los planos reguladores, es un elemento de preocupación para el conglomerado público y constituye un grave problema.

(9) Que en el interés público debe evitarse lo antes posible el desmedido y desproporcional aumento en el precio de las tierras en el mercado.

Declarada la existencia de tales males, expresó la Asamblea Legislativa:

(a) Que el aumento continuo en el precio de los terrenos no puede ser controlado, ni los problemas que ello crea pueden ser resueltos, por los instrumentos con que cuentan los gobiernos del Estado Libre Asociado y de los municipios.

(b) Que la imposición de contribuciones, y los reglamentos de planificación física, resultan insuficientes.

(c) Que la reglamentación sobre subdivisión y zonificación opera prospectivamente para áreas no desarrolladas y subdesarrolladas, y no pueden eliminar los usos legales no conformes de los terrenos.

(d) Que la reglamentación sobre subdivisión de terrenos no es suficiente: (i) ni para controlar la expansión de los límites de las ciudades ni (ii) para controlar expansiones desarticuladas e inadecuadas de las ciudades.

Ante la ineficacia de los medios y maneras presentes para afrontar los males enunciados, la Asamblea Legislativa declaró:

(a) Que para controlar el grave problema del aumento en el precio de los terrenos puede darse la máxima utilización a los fondos públicos, autorizándose cuando fuere necesario, la obtención de propiedad privada.

(b) Que es la determinación legislativa que las disposiciones de la Ley Núm. 13 de 16 de mayo de 1962, creadora de la Administración de Terrenos, se adopten como una necesidad de política pública.

(c) Que la reserva de terrenos autorizada por las disposiciones de dicha Ley constituye, por sí mismo, un fin público.

(d) Que es la intención de la Asamblea Legislativa que las actividades de la Administración de Terrenos creada por la referida Ley: (i) promuevan en forma planificada y eficiente el bienestar, la libertad económica y la justicia social de los actuales y futuros habitantes de Puerto Rico, mediante el uso eficiente de los terrenos y la habilitación de nuevas áreas en cualquier parte de Puerto Rico, a fin de asegurar el mejor equilibrio en cuanto a las necesidades de las futuras comunidades en armonía con el medio económico y geográfico; (ii) preserven los valores históricos y los valores naturales de la tierra; (iii) aseguren las mejores condiciones de salubridad, seguridad y comunidad, mayores facilidades recreativas, mayores y mejores servicios esenciales; (iv) eviten la concentración de terrenos, para fines especulativos, en

manos de cualquier persona; (v) desarrollen programas para la adquisición de los terrenos necesarios y para encauzar todo tipo de proyecto, por sí sola o conjuntamente con otras agencias gubernamentales, de los Estados Unidos o con entidades privadas; (vi) promuevan aquella acción encaminada a la mejor utilización y aprovechamiento de los terrenos a base de costos más razonables en beneficio del bienestar de la comunidad, particularmente en las zonas de potencial desarrollo; (vii) establezcan reservas adecuadas de terreno para ayudar al Estado Libre Asociado a realizar su política pública de desarrollo industrial, comercial y de hogares, a proveer servicios públicos de modo que haya un desarrollo ordenado en armonía con los planos reguladores, y le ayude a desempeñar más efectivamente su responsabilidad gubernamental de mantener la salud, la seguridad y el bienestar de los habitantes.

(e) Que es la intención de la Asamblea Legislativa que la Administración ejerza todos los poderes necesarios (i) para llevar a cabo sus actividades; (ii) para adquirir cualquier propiedad, derecho o servidumbre que propicie el desarrollo, aprovechamiento y conservación de áreas abiertas en su estado natural, proteja los cuerpos de agua, conserve los suelos y bosque, preserve la belleza de los parajes destinados al uso público; proteja de los efectos de las inundaciones, y facilite el uso y desarrollo de áreas reservadas para proyectos de interés público; (iii) para disponer de su propiedad inmueble en las condiciones, o con las limitaciones en cuanto a su uso y aprovechamiento que sean necesarias y convenientes, evitando que el destino que se le dé a dicha propiedad pueda propender a crear o mantener condiciones indeseables o adversas al interés públicos; (iv) para establecer, cuando venda o de otro modo disponga de su propiedad, aquellas restricciones que limiten las ganancias que, en el precio a pagarse por el público, habrá de tener el adquirente respecto al

terreno; (v) para desarrollar proyectos de rehabilitación de terrenos, mediante desecación, desagüe, relleno, regadío o cualquier otro método adecuado para aumentar la utilización de terrenos.(6)

<hr>

(6) El Gobernador de Puerto Rico envió a la Asamblea Legislativa el 23 de abril de 1962 un anteproyecto de lo que fue luego la Ley Núm. 13, acompañado de su Mensaje especial, en el que sugería, dada la naturaleza de la legislación propuesta que podía inducir a especulaciones indeseables, la acción legislativa rápida y en el plazo más breve compatible con la discusión democrática y cabal de dicho proyecto.

Manifestó el Gobernador que la inflación en el precio de los terrenos en San Juan y en otras zonas urbanas y partes del país, constituyen un grave problema para las familias de escasos y moderados recursos, para la industrialización y para el desarrollo de las obras públicas y el ordenado crecimiento de ciudades y pueblos. Que esta condición es contraria al mejor interés público porque:

1. Se dificulta la realización de proyectos de viviendas para familias de escasos o moderados recursos.

2. Se encarece todo el programa de obras públicas, que costean todos los contribuyentes.

3. Se encarece la construcción de fábricas para el programa de industrialización.

4. Se desorbitan las ciudades en su crecimiento al verse obligadas a crecer a "saltos de conejo" por quedar disponibles los terrenos de precios relativamente bajos a bastante distancia de las áreas construidas. Esto a su vez agrava el problema de la transportación y el de la prestación de servicios públicos eficaces y económicos a los nuevos vecindarios, y en general se crean problemas que en conjunto son de gran magnitud, complejidad y gravedad.

Recomendó el Gobernador que se legislara para:

a. Frenar el alza desmedida en el precio de los terrenos.

b. Eliminar las prácticas de especulación en terrenos que sólo benefician a unos pocos en perjuicio de la totalidad de la creciente población.

c. Asegurar que puedan desarrollarse proyectos de vivienda a bajo y mediano costo para las familias que aún no tienen su propio hogar.

d. Asegurar un costo razonable para los terrenos necesarios para fines industriales y comerciales que se consideren indispensables a la vida y el progreso de Puerto Rico.

e. Asegurar la creación de un inventario de terreno para toda obra pública que pueda realizarse en el curso de, por lo menos, los próximos diez años.

f. Ayudar a que el crecimiento de nuestras ciudades responda al mayor bien general.

Una más cabal comprensión del problema que preocupaba al Gobierno y de su gravedad se complementa con los hechos, datos, estadísticas, actitudes socio-económicas, tendencias agiotistas, etc. revelados en

516

Conforme a la abarcadora declaración de intención y de propósitos legislativos, así confirió la Asamblea Legislativa poderes a la Administración.—Arts. 7, 8, 16 de la Ley Núm. 13. Entre ellos el pleno poder para realizar la política pública del Estado Libre Asociado según declarada en el estatuto.

Conferido por delegación del Estado a la Administración el poder de expropiación forzosa, la propia Asamblea Legislativa declaró de *utilidad pública* toda propiedad necesaria para cumplir los fines de la Ley, y toda obra o proyecto de la Administración.—Art. 13.

Fue mandato expreso de la Asamblea Legislativa a la Administración, entre otras directrices expresas, que cuando la Administración vendiere o de cualquier otro modo dispusiere de su propiedad con el propósito de que el adquirente la desarrolle en urbanizaciones o cualquier otro tipo de proyecto que implique una subsiguiente venta a personas particulares, *deberá* incluir una restricción limitativa de las ganancias que respecto del terreno y todo otro costo del proyecto, habrá de obtener el adquirente.—Art. 7(z).

Expresamente le permitió la Asamblea Legislativa a la Administración el disponer de su propiedad o de cualquier derecho o interés en la misma por precio inferior al que pagó por ella [con pérdida], si con ello se lograren los propósitos establecidos en la Ley.

Incuestionablemente, la Ley Núm. 13 posee todas las características de una legislación de emergencia—cf. Art. 7(c), (e), (o); Arts. 9, 11, 14(g), 18—conmensurables sus dispo-

los amplios y movidos debates legislativos del Proyecto de la Ley Núm. 13. Consúltese el *Diario de Sesiones*, Vol. 15, Tomo 3, págs. 1012 y ss. (Senado, 3 de mayo de 1962); págs. 1042 y ss. (Cámara, 3 de mayo de 1962). Véase el Informe Conjunto del Proyecto sometido por las Comisiones de Hacienda y Obras y Terrenos Públicos del Senado y de la Cámara. *Diario*, id. págs. 1007–1012; 1047–1052.

Luis F. Negrón García, *"Impacto del Aumento en el Costo de las Tierras en Puerto Rico: La Administración de Terrenos como Instrumento del Urbanismo"*. Rev. Jur. U.P.R., Vol. XXXII, Núm. 4 (1963).

siciones con la gravedad del problema a atacarse, para el cumplimiento de las cuales la Asamblea Legislativa destinó de inmediato cuantiosos fondos públicos. Tales remedios para tales males.

## —III—

Contra el hecho de la existencia real de todo lo anteriormente expuesto, debemos enfocar la cuestión litigiosa y pasar juicio legal sobre el fallo de la Sala sentenciadora.

En el tribunal de instancia los demandados apelados hicieron un ataque frontal a la constitucionalidad de la Ley Núm. 13. [7]

---

[7] Entre otras impugnaciones alegaron:

(a) Que la Ley Núm. 13 es inconstitucional y nula por constituir una indebida delegación por el Poder Legislativo de la facultad de expropiación y porque no establece norma o regla, justa y razonable, para el ejercicio de dicha facultad, en violación de la Constitución del Estado Libre y de la de los Estados Unidos.

(b) La expropiación en virtud de esta Ley no es para un fin o propósito público. Persigue un propósito de naturaleza privada encaminado a desposeer a los demandados de su derecho de propiedad sin que exista razón de utilidad, emergencia, o necesidad pública alguna. Por tal razón la Ley Núm. 13 viola sus derechos constitucionales bajo las Constituciones mencionadas.

(c) La Ley Núm. 13 es inconstitucional y nula porque viola la disposición congresional que limita la tenencia de tierra por corporaciones a 500 acres, y porque viola la disposición constitucional que prohibe que una corporación se dedique a negocios de compraventa de bienes raíces.

(d) La Ley Núm. 13 es inconstitucional porque viola el derecho de la igual protección de las leyes.

(e) Porque autoriza la dedicación de fondos públicos para uso privado.

(f) Porque priva a los demandados de su propiedad sin el debido procedimiento de ley.

Los demandados hicieron otros ataques, esta vez al procedimiento en sí ya dentro del marco de las disposiciones de la Ley Núm. 13 y contra la autoridad de los funcionarios para interponer la acción a tenor de la propia Ley.

Podemos dejar resuelto desde ahora que a la luz del récord y de los hechos, estos otros ataques carecen de mérito y son insostenibles. También carecen de mérito aquéllos referentes a la inconstitucionalidad de la Ley Núm. 13, tales como la delegación sin normas adecuadas, la tenencia en exceso de 500 acres, las transacciones en bienes raíces, la negación de la igual protección constitucional de la ley. En la concesión de poderes y facultades a la Administración para ejercer sus funciones, específicamente la

La Sala sentenciadora hizo abundantes pronunciamientos con una fuerte implicación de inconstitucionalidad de la Ley Núm. 13. ([8]) No obstante, hallamos su fallo o *ratio decidendi* en las siguientes determinaciones de derecho:

facultad de expropiación, la Ley Núm. 13 está repleta de normas y directrices básicas a ser observadas. En 1962 no regía en Puerto Rico la disposición congresional de los 500 acres. No obstante, véase *People of Puerto Rico* v. *Eastern Sugar Associates,* (1st Cir.), 156 F.2d 316, cert. den. 329 U.S. 772, y las expresas disposiciones de la Sec. 14 del Art. VI de la Constitución del Estado Libre Asociado.

Queda para enjuiciamiento la impugnación a la constitucionalidad de la Ley Núm. 13 por la alegada inexistencia de un fin o propósito público y la alegada asignación de fondos públicos para objetivos privados.

([8]) Por ejemplo: Dijo el tribunal, y lo apoyan los demandados apelados, que la Ley Núm. 13 no define la política pública del Estado o sea el medio que adoptó el Legislador para encarar el problema, y que motiva honda preocupación la "ausencia total de una definición clara y terminante de la política pública específica del Estado frente al mal que se intenta resolver."

La lectura del estatuto nos convence de lo contrario.

A tenor de la Sec. 9 del Art. VI de la Constitución del Estado Libre Asociado—Sólo se dispondrá de las propiedades y fondos públicos para fines públicos . . . y en todo caso por autoridad de ley—entendió la Sala que "la total ausencia" de guías apropiadas en la Ley para la disposición por la Administración de sus bienes y fondos "permite una situación que vicia su constitucionalidad."

No creemos que exista esa "total ausencia" de normas. Entendemos, por el contrario, que la Ley contiene suficientes directrices al efecto de que la disposición de su propiedad y fondos por la Administración deberá siempre conducir a dar cumplimiento a cualquiera de los fines y propósitos dictaminados por la Asamblea Legislativa, y no responderá a otros.

Declaró la Sala, y apoyan los demandados apelados, que por no proveer revisión judicial alguna a las actuaciones de la Administración, "excepto en los casos de expropiación como el presente" la constitucionalidad de la Ley Núm. 13 "resulta precaria en extremo."

Asumiendo que el supuesto de derecho fuera correcto, aquí se pierde de vista el hecho que la Administración de Terrenos es un organismo totalmente ejecutivo y no cuasi-judicial o con función de adjudicar controversias en la esfera administrativa. Puede ser demandada—Art. 7(f)— y como toda otra función ejecutiva sus actuaciones en el curso de sus negocios están sujetas a la jurisdicción judicial ordinaria.

Concluyó la Sala que de "igual o mayores visos de inconstitucionalidad" están permeadas las disposiciones de la Ley Núm. 13 que autorizan la adquisición de terrenos "para reservas".

Cabe recordar que ante la naturaleza del problema o el mal que quiso atacar y disolver, la Asamblea Legislativa declaró que la "reserva" de

"Habiéndose impugnado en el presente caso la suficiencia de la alegación relativa al uso contemplado, así como el carácter público del mismo, es función de este Tribunal determinar y resolver, en definitiva, si el fin que se expone constituye o no un uso público. Esa determinación requiere consideremos los hechos y circunstancias presentes en este caso en particular. [cita]

---

terreno constituía, *por sí misma*, un fin público. Ante el problema, no puede sostenerse que ésta fuera una declaración arbitraria o sin base de razón.

Otros criterios de la Sala han sido que la "ambigüedad" de la Ley Núm. 13 y su falta de normas se presta a que la Administración sea tentada a adquirir bienes para convertirse en otra especuladora en busca de ganancia, a expropiarlos "al único efecto" de beneficiarse del aumento en el valor de las tierras, así como a incurrir en otras prácticas ajenas a su encomienda por falta de limitación a sus extraordinarios poderes en el uso y disposición de su propiedad. Que "la ausencia de remedio judicial o en equidad", la falta de normas en la adquisición, uso y disposición de su propiedad unida a la "posible especulación" en terrenos a que se presta la Ley, "matiza de inconstitucionalidad" el estatuto.

En lo que toca a los propósitos de la Asamblea Legislativa, la Ley contiene normas suficientes. Si la Administración mañana pervirtiera su razón de ser, sería problema para la Legislatura. Una especulación de la Sala de que los propósitos de la Ley pudieran ser subvertidos, no debe ser impedimento ahora en cuanto al ejercicio soberano del poder de expropiación.

Concluyó la Sala sentenciadora que el Ámbito del Proyecto y "la evidente intención" del Art. 14, inciso (f) "de excluir todo incremento en la valoración de los terrenos a adquirirse", permite y autoriza que la Administración expropie por ese precio inferior negando la justa compensación, siendo el estatuto en sí, y el Ámbito del Proyecto, contrarios a la Constitución en privación de la propiedad sin el debido procedimiento de ley.

Asumiendo que el Art. 14(f) dispusiera lo dicho, el problema es uno de justa compensación (no está envuelta en este recurso) de la responsabilidad final del Poder Judicial con independencia del Legislativo, pero no sería obstáculo para el ejercicio del poder soberano de expropiación.

La Sala entró en otras consideraciones, tales como que no existía un plano regulador; la Junta de Planificación no estuvo justificada en rechazar la consulta de los demandados para el desarrollo de sus terrenos; ni los terrenos de los demandados eran terrenos "vacantes urbanizables".

El Ámbito del Proyecto aprobado por la Junta de Planificación constituía un Plano Regulador en sí. La negativa de la Junta para aprobar las consultas o proyectos de los demandados no era revisable en estos procedimientos en que la Junta tampoco era parte, ni el hecho de que un propietario esté realizando obras o tenga proyectos con su propiedad puede ser obstáculo al ejercicio del poder soberano de expropiación forzosa, sino que él tiene derecho a una justa compensación. En el significado en

La cuestión del uso público no puede enfocarse en forma dogmática y sí de manera realista, resolviendo cada caso por sus propios méritos. El término 'uso público' no se puede definir en contraposición al concepto 'uso privado'. [cita] El concepto 'uso público' no admite una definición precisa. [cita]

En la interpretación y aplicación del término, en esta jurisdicción prevalece la llamada doctrina liberal. El concepto 'uso público' se adoptó en la Constitución del Estado Libre Asociado de Puerto Rico con el significado imprimídole por decisiones judiciales anteriores. [citas] La interpretación de leyes sobre expropiación, así como los estatutos que hacen delegación del poder legislativo o que interfieran con el derecho de propiedad, sin embargo, deben interpretarse restrictivamente." [cita]

Convenimos—aunque con la observación que la interpretación debe ser siempre aquella que conduzca a dar eficaz cumplimiento a los fines o propósitos legislativos, no forzosamente una restrictiva—en que los anteriores supuestos de derecho son sustancialmente correctos.

Continuó la Sala y lo apoyan los demandados apelados:

"Germana al problema del uso público surge la cuestión de la necesidad y utilidad pública en cualquier expropiación. El artículo 13 de la ley de la Administración declara de utilidad pública todos los bienes que sean necesarios 'para llevar a cabo los fines de la ley' así como toda obra o proyecto que lleve a cabo la Administración. Esta declaración requiere un análisis de sus precedentes legislativos.

.    .    .    .    .    .    .    .

Existe marcada diferencia entre la declaración de utilidad pública que aparece en la ley creando la Administración y aquella que autoriza la Ley General de Expropiación. La declaración de utilidad pública que contiene la ley de la Administración priva al ciudadano de los derechos que le favorecían al amparo de la Ley General de Expropiación. En efecto, bajo esta

---

que para los propósitos de la Ley la Asamblea Legislativa dio al concepto "propiedad vacante", y en el significado que le dio la Junta de Planificación y la Junta de Gobierno de la Administración, los terrenos del demandado y de los otros dueños integrados en un proyecto eran terrenos vacantes:—área no urbanizada ubicada entre otras áreas ya urbanizadas.

última la declaración de utilidad pública requiere previa audiencia en todo caso a los interesados 'sobre la conveniencia de dicha declaratoria y sobre la necesidad para el mejor servicio público y mejor realización con tal fin de la obra' . . . . (*) La Legislatura no pudo tener ante sí, como no lo tiene este Tribunal, indicio alguno revelador del 'uso público' a que la Administración intenta destinar los bienes que pretende expropiar.

· · · · · · ·

La 'necesidad' que justifica una expropiación es aquella que existe al presente o en un futuro inmediato y se requiere tanto para la expropiación en sí como para la obra pública que se contempla. No basta una necesidad futura, indefinida, remota o especulativa. [cita] . . . .

La regla 58 de Procedimiento Civil, dijimos ya, requiere una alegación específica del uso público . . . .

La alegación respecto al uso público que se hace en la demanda es indudablemente ambigua e imprecisa. De igual ambigüedad e imprecisión participan las resoluciones números cinco

---

(*) La Ley de Expropiación Forzosa de 12 de marzo de 1903 dispone en su Art. 2 según ha sido enmendado, que la propiedad privada podrá tomarse o perjudicarse . . . . para fines legales cuando haya sido declarada de utilidad pública por el Gobernador o el funcionario o la agencia que él designe. La declaración de utilidad pública será hecha por el Gobernador o el funcionario o la agencia por él designada, previa audiencia en todo caso, de aquellos a quienes interese ser oídos sobre la conveniencia de dicha declaratoria y sobre la necesidad para el mejor servicio público y mejor realización del fin de la obra.

Se concibe que lo anterior no priva a la propia Asamblea Legislativa, en donde reside en su origen el poder soberano de expropiar, de hacer ella misma en un estatuto la declaración de utilidad pública aun con mayor autoridad que la hecha por un funcionario, sin que sea necesaria una audiencia. A todas luces, si la utilidad no fuere pública, la declaración puede atacarse judicialmente por la parte afectada en el procedimiento de expropiación lo mismo se hiciere como dispone la Ley de Expropiación Forzosa general, o ya la hiciere la propia Asamblea Legislativa, como en la Ley Núm. 13. La falta de audiencia previa en lo que respecta a la declaración de utilidad pública no es un vicio constitucional que implique violación del debido procedimiento de ley. *North Laramie Land Co.* v. *Hoffman*, 268 U.S. 276, pág. 284; *Georgia* v. *Chattanooga*, 264 U.S. 472, pág. 483; *Bragg* v. *Weaver*, 251 U.S. 57, pág. 58 y casos ahí citados; *Sears* v. *City of Akron*, 246 U.S. 243, pág. 251.

Según la evidencia, en este caso hubo también la declaración de utilidad pública en lo que respecta a los bienes específicos del demandado, hecha por la Junta de Gobierno de la Administración.

y seis de la Junta de Gobierno de la Administración . . . . Las
contestaciones del Estado a los requerimientos de admisión y a
los interrogatorios que le fueron sometidos por los demandados
y ofrecidos en evidencia, así como las manifestaciones en corte
abierta de los abogados del poder expropiante, reconocen que no
se expropia *'para un uso público específico'* y sí *'para los fines
y propósitos generales que enmarca la ley de la Administración.'*
[Hemos puesto el énfasis.] La propiedad privada y, por ende,
los terrenos a que se refiere este pleito, no pueden ser expropia-
dos para un uso no revelado. [cita]

No habiéndose alegado ni probado en este caso un uso pú-
blico conforme a derecho, este Tribunal debe resolver, como
resuelve, que no existe necesidad pública alguna que justifique la
adquisición por el Estado de los bienes propiedad de los deman-
dados.

.        .        .        .        .        .        .        .

Ante esos hechos y circunstancias debemos concluir, como
concluimos, que el procedimiento para la expropiación de las
propiedades objeto de este pleito no se ha tramitado de confor-
midad con la legislación pertinente. La imprecisión del estatuto,
de las resoluciones #5 y #6 de la Junta de Gobierno de la
Administración; la insuficiencia de la prueba, la ausencia de
plano regulador alguno y de un Reglamento que rija a la Admi-
nistración; las actuaciones de las agencias concernidas; la falta
de uso público definido, y la falta de necesidad para la adquisi-
ción que se interesa, violan el debido procedimiento de ley e
invalidan la presente acción. (*)"

---

(*) Al constituirse, en su reunión de 3 de julio de 1962, la Junta de
Gobierno adoptó un Reglamento para el funcionamiento de la Adminis-
tración. La Sala sentenciadora más bien tiene en mente un reglamento de
normas sustantivas. En 20 de junio de 1966, la Administración radicó en
la Secretaría de Estado un Reglamento que contiene normas en cuanto a
la disposición de terrenos, publicado en el Boletín de Puerto Rico, Vol. 5,
Núm. 6, en 30 de junio de 1966. 23 R.&R.P.R. sec. 311f–1 a 311f–103.

Los apelados conceden suma importancia a la mencionada falta de
un "Reglamento" de normas sustantivas. Un examen de las Minutas de
las reuniones de la Junta de Gobierno (Exh. C de los demandados) de-
muestra, en la discusión y consideración de los acuerdos tomados, que
se actuaba para responder a las normas básicas de la Ley con miras a
cumplir sus propósitos, y no al capricho.

Con estos dictámenes se declaró sin lugar la demanda de expropiación, y se anuló el título de propiedad investido en el Estado Libre Asociado en 5 de diciembre de 1963, ordenándose su cancelación en el Registro de la Propiedad.

Con estos dictámenes no podemos convenir del todo. El enfoque de la Sala sentenciadora, que no vio un uso o interés público en esto, está un tanto fuera de foco en los tiempos presentes. Responde a la era del ayer característica de la función limitada y restringida a los actos meramente gubernativos y de administración de la cosa pública, del Gobierno, como único deber del Estado para con la comunidad y sus gobernados. Responde también al rancio concepto individualista del exclusivo derecho al uso, goce y disfrute de la propiedad por su propietario, ya no prevaleciente cuando se precisa confrontarlo con el bien común.

—IV—

En una comprensiva exposición que nos hace sobre el aspecto social, económico y técnico-profesional del urbanismo, fenómeno universal éste que hoy día conturba a las sociedades, a aquellas particularmente en proceso de desarrollo, el Procurador General nos ofrece algunos criterios autorizados de destacadas personas y entidades conocedoras del problema. Del Informe de la Conferencia de las Naciones Unidas para la Aplicación de la Ciencia y la Tecnología para Beneficio de las Áreas Menos Desarrolladas, Vol. V, *"People and Living"*, 1963, Publicaciones de las Naciones Unidas, pág. 167:

La falta del necesario poder legal para promover el desarrollo y encauzarlo en la dirección deseada constituye un obstáculo para los planificadores urbanos en las economías de libre empresa y economías mixtas, particularmente en lo que respecta al uso de la tierra y expropiación . . . ; que los planificadores y los economistas del urbanismo están ampliamente de acuerdo en que la posesión de la tierra por el gobierno en áreas en desarrollo

ofrece el medio más efectivo de control, evita los efectos indeseables de la especulación individual con la tierra, y en última instancia asegura un medio de recursos para los servicios del gobierno . . . . La posesión de la tierra debía retenerse firmemente en poder público . . . en países en desarrollo, el gobierno debe adquirir la tierra ante el problema económico de su desarrollo.

Que el enfoque de la Ley Núm. 13 de 1962 y los medios y maneras en ella concebidos no son una innovación o mero invento lo demuestran estas otras citas que nos suple el Procurador General:

De John Graham, Jr., *"Housing in Scandinavia,"* The University of North Carolina Press, 1940, pp. 3, 7.

El problema de la adquisición de tierra es hoy uno general. Las ciudades americanas, en su rápido crecimiento han estado más interesadas en las transacciones de terrenos con las ganancias acumulándose al individuo que en consideraciones sobre las conveniencias de la comunidad. La especulación en valores de los terrenos y la explotación desenfrenada han sido responsables de los precios artificiales y excesivos de la tierra. Comparando, dice el autor que durante un período de años las municipalidades de Copenhagen, Helsinki y Estocolmo han venido adquiriendo terrenos dentro y en la periferia de sus demarcaciones y cada día adquieren más. El propósito de estas adquisiciones según las autoridades suecas es el asegurar predios para fines de vivienda y *para influir en el precio de la tierra* de modo de prevenir la especulación irrefrenable. Además, permite a las municipalidades, en un largo período de años, cambiar el plano municipal, obtener sitios céntricos para las necesidades municipales y ofrecer acceso fácil y económico a las partes de la ciudad que puedan haberse convertido en arrabales.

Continúa:

Conceder el valor social de la tierra no quiere decir que se trate como propiedad común. Es más bien reconocer que la comunidad tiene el derecho previo de determinar, tanto para el presente como para el futuro, el uso apropiado de la tierra, sea para vivienda, uso industrial, comercial, agrícola o público. La misión de la propia tierra es actuar como un agente cataliza-

dor que ayude al capital al desarrollo y sirva al individuo y a las necesidades comunales sin perder su identidad como tierra o despojarse de su valor inherente. En la concepción social del valor de la tierra lo que el individuo posee no es la tierra misma sino el privilegio de dedicar esa tierra a su mejor uso según lo determine la sociedad.

Este concepto social de la tierra aleja la idea que la tierra es un producto de comercio que se presta a la especulación y a la explotación para el beneficio privado, sujeto a las fluctuaciones caprichosas del capital. Sin destruir el concepto de la propiedad privada, los escandinavos enfatizan el concepto social de la tierra en su abarcadora y previsora política de adquisición de terrenos.

Entre las conclusiones que nos somete el Procurador General de la Conferencia de Harvard de 1962 sobre el problema del urbanismo, con la participación de destacadas personas, están:

La fijación de un área metropolitana; un plan de desarrollo; definir el "fin público" como cualquier uso estimado por la autoridad metropolitana esencial al plan de desarrollo; adquisición por expropiación si fuere necesario, de cualquier terreno dentro del área para el fin público según expresado; permitir a los dueños de propiedad usar la misma sólo conforme al plan de desarrollo. La tierra debe dedicarse a su mejor uso posible en interés de la comunidad sin consideración al costo de adquisición de un terreno.

Y de Guy Greer, Walter Gropius y Martín Wagner nos cita:

La miopía ciudadana y falta de visión colectiva en el manejo de la tierra urbana es una de las causas mayores del fracaso del patrón de una ciudad mejor, tan necesitada. La tierra se ha negociado en las oficinas de los traficantes en bienes como si fuera un producto de comercio. La tierra no es un artículo de consumo, ya que no puede ser producida, reemplazada o movida. La tierra es de tal naturaleza peculiar que debe ser poseída por las comunidades, que constituyen cada vez más el factor constante de la sociedad. Si la comunidad pudiera gradualmente redimir la tierra, podría controlar la demarcación entera necesaria para su desarrollo. Tal política pública de adquisición de tierra en gran escala es indispensable para el mejoramiento de las

ciudades viejas, para el cambio de una aglomeración sofocante a la amplitud de la ciudad futura. *"The Problem of Cities and Towns"*, págs. 87, 93, 110, 113.

También nos ofrece el Procurador General estos otros criterios de Charles M. Haar, *"Land Planning Law in a Free Society"*, Harvard University Press, 1951, pág. 127:

La posesión pública de la tierra lleva dos tipos distintos de ventajas. La propiedad por el Estado es el método más directo de eliminar el conflicto entre el interés privado en destinar determinado terreno al uso más beneficioso para el cual encuentre un mercado, y el interés público de asegurar el mejor uso de todo terreno sin tomar en cuenta la ganancia monetaria. El costo social de la subdivisión especulativa ha hecho concluir a algunos expertos que la única esperanza de un crecimiento económico y eficiente de la ciudad es la posesión pública de las áreas periféricas. Comprando la tierra en la dirección del desarrollo, las ciudades tienen el poder de determinar el ámbito de su crecimiento futuro. No han de depender del capricho de un individuo. Además, los dueños aislados pudieran no tener ni los medios ni el incentivo para el desarrollo. Y siempre existe el problema de aquel dueño recalcitrante, que puede impedir un plan de mayor interés para la comunidad.

Hasta aquí, las citas del Procurador.

Los conceptos expresados no son privativos de las comunidades nórdicas y anglosajonas hoy día extensamente socializadas. En la sacudida a la conciencia social que hace León XIII, si bien se reconoce un derecho "natural" a la propiedad privada, se enfatiza el sentido social de la misma. *Rerum Novarum*, 1891. Refiriéndose a la Encíclica leoniana, comenta Juan XXIII:

"Como es sabido, en aquel entonces la concepción del mundo económico más difundida y puesta por obra en mayor escala era una concepción naturalista, que niega toda relación entre lo moral y la economía. Motivo único de la acción económica, se afirmaba, es el provecho individual. Ley suprema reguladora de las relaciones entre los factores económicos es una libre concurrencia sin límite alguno. Intereses de los capitales, precios de las mercancías y de los servicios, ganancias y salarios se deter-

minan pura y mecánicamente por virtud de las leyes del mercado. *El Estado debe abstenerse de cualquier intervención en el campo económico.* Las asociaciones sindicales, según las naciones, se prohiben, se toleran o se consideran como un derecho privado. [Énfasis puesto.]

En un mundo económico concebido en esta forma, la ley del más fuerte encontraba plena justificación en el plano teórico y dominaba el terreno de las relaciones concretas entre los hombres. De allí surgía un orden económico turbado radicalmente."

Y luego:

"La propiedad privada, incluso la de los bienes instrumentales, es un derecho natural que el Estado no puede suprimir. *Es intrínseca a ella una función social,* pero es también un derecho que se ejercita en bien propio *y de los demás.*" (Énfasis puesto.) *Mater et Magistra,* 1961.

Refiriéndose también a la evaluación de la doctrina social de *Rerum Novarum* que cuarenta años después hace Pío XI—*Quadragesimo Anno,* 1931—observa el Papa Juan XXIII que Pío XI aprovechó la ocasión para precisar algunos puntos sobre los cuales habían surgido ciertas dudas y para desarrollar su pensamiento social cristiano conforme a las nuevas circunstancias de los tiempos, y dice:

"Las dudas se referían, en modo especial a la *propiedad privada,* al régimen de salarios, a la conducta de los católicos ante una determinada forma de socialismo moderado.

En cuanto a la propiedad privada, Nuestro Predecesor confirma el carácter de derecho natural, que le compete, y acentúa su aspecto social y su función respectiva." (Énfasis puesto.) (9)

---

(9) Por supuesto, ha existido históricamente divergencia de criterio filosófico en cuanto a si el derecho de propiedad individual es un derecho natural o de Dios, como lo entiende la Iglesia, o no. Montesquieu y Bentham creen que no al decir el primero:

"Así como los hombres han renunciado a su independencia natural para vivir bajo las leyes políticas, han renunciado también a la comunidad natural para vivir sujetos a las leyes civiles. Las primeras de estas leyes les adquirieron la libertad, las segundas la propiedad."

Así, aunque admite un primer estado de propiedad común en el origen

528

Pero no escapa a la atención de Pío XI que en los cuarenta años pasados desde la promulgación de la Encíclica leoniana la situación histórica había sufrido un profundo cambio. Efectivamente, la libre concurrencia, en virtud de una dialéctica intrínseca a ella, había terminado por destruirse o casi destruirse ella misma; había conducido a una gran concentración de la riqueza y a la acumulación de un poder económico enorme en manos de pocos, *y éstos frecuentemente ni siquiera propietarios, sino sólo depositarios y administradores del capital, del que disponían a su gusto y placer.*

Por tanto, como observa acertadamente el Sumo Pontífice, *a la libertad de mercado ha sucedido la hegemonía económica; a la avaricia del lucro ha seguido la desenfrenada codicia del predominio; así, toda la economía ha llegado a ser horriblemente*

—según observa Gutiérrez Fernández—funda sobre la renuncia de ese estado la propiedad que debe su origen exclusivamente a las leyes civiles. Y Bentham:

"Procurando averiguar la noción exacta de la propiedad, veremos que no hay propiedad natural; que es únicamente obra de las leyes. La idea de la propiedad consiste en una esperanza establecida en la posesión de poder sacar tal o cual ventaja de la cosa según la naturaleza del caso. Ahora bien: esa persuasión, esa esperanza no pueden ser más que obra de la ley. Yo no puedo contar con el goce de lo que miro como mío, sino bajo la promesa de la ley, que me lo garantiza. . . . La propiedad y la ley han nacido juntas y morirán juntas. Antes que hubiese leyes no había propiedad; quitad las leyes, y toda propiedad acaba." Gutiérrez Fernández, *Códigos o Estudios Fundamentales sobre el Derecho Civil Español*, 1868, Tomo II, págs. 53, 54.

También acorde con la concepción legalista del derecho de propiedad nos parecen las disposiciones del Art. 5 del Código Político de 1902:

"El derecho *primitivo y final* a todos los bienes inmuebles y muebles, dentro de los límites del territorio de Puerto Rico, y no pertenecientes a los Estados Unidos, *reside* en el pueblo de dicho territorio." Véanse los Arts. 6 y 9, Cód. Pol.

"Como se sabe, por las investigaciones históricas, los primitivos pueblos nómadas no reconocían derecho individual sobre las tierras. Se desconocía el cultivo de las mismas y cada grupo o tribu se establecía indistintamente en un *sitio* o en otro de acuerdo con su conveniencia, ya que las tierras se consideraban inapropiables; pero al llegar el período agrícola se reconoció en principio la propiedad territorial exclusivamente a favor del Estado. Es por ese derecho de origen que el Estado conserva sobre todo el territorio de cada país lo que en derecho se denomina el *dominio eminente.*" (Énfasis del autor.) Lcdo. José López del Valle, *"Origen y Desarrollo del Registro de la Propiedad"*: La Toga, publicación del Colegio de Abogados, oct. y nov., 1967.

*dura, inexorable, cruel,* determinando el servilismo de los poderes públicos a los intereses de grupo, y desembocando en el imperialismo internacional del dinero." (Ambos énfasis son del autor.)

Como remedios, entre otros:

" . . . la prosecución de los intereses, individuales y de grupo, en el ámbito del bien común . . . el establecimiento de la autoridad de los poderes públicos en el desenvolvimiento de las funciones que son de su competencia respecto a la realización del bien común."

Como motivos:

"[q]ue debemos afanarnos en dar vida a una ordenación jurídica,, interna e internacional, con un complejo de instituciones estables, *tanto públicas como privadas,* ordenación inspirada en la justicia social, con la cual concuerde la economía, de tal manera que resulte *menos difícil a los economistas desarrollar sus actividades* en armonía con las exigencias de la justicia, *dentro de la esfera del bien común.* [Énfasis nuestro.]

⋅　　⋅　　⋅　　⋅　　⋅　　⋅　　⋅　　⋅　　⋅

Ciertamente, añade Nuestro Predecesor, también el derecho de propiedad sobre los bienes es un derecho natural; sin embargo, según el orden objetivo establecido por Dios, el derecho de propiedad está dispuesto de tal manera que no puede constituir obstáculo para que sea satisfecha la *inderogable exigencia de que los bienes, creados por Dios para todos los hombres, equitativamente afluyan a todos, según los principios de la justicia y de la caridad."* (Énfasis es del autor.) (10)

(10) Sobre la intervención del poder público en el campo económico, observa la Encíclica que en este campo deben estar activamente presente los poderes públicos "a fin de promover debidamente el desarrollo de la producción en función del progreso social en beneficio de todos los ciudadanos." Su acción debe inspirarse en el principio de su misión subsidiaria. Los poderes públicos, responsables del bien común, deben sentirse obligados "a desenvolver en el campo económico una acción multiforme, más vasta, más profunda y más orgánica, como también a ajustarse a este fin en las estructuras, en las competencias, en los medios y en los métodos."

Pero se afirma el principio que la presencia del Estado en el campo económico, por dilatada y profunda que sea, no se encamina a empequeñecer la esfera de la libertad en la iniciativa de los ciudadanos particulares, sino antes a garantizar a esa esfera la mayor amplitud posible, "tutelando

Ya hablando por sí misma *Mater et Magistra* para los tiempos del presente, ante el concepto naturalista del derecho de propiedad, afirma:

"El derecho de propiedad privada de los bienes, aun de los productivos, tiene valor permanente, precisamente porque es derecho natural fundado sobre la prioridad ontológica y de finalidad de los seres humanos particulares respecto a la sociedad."

Hace suya, entonces, las observaciones de Pío XII, 1944, al efecto de que al defender la Iglesia el principio de la propiedad privada, de ningún modo pretende sostener un presente estado de cosas, "ni proteger por principio al rico y al plutócrata contra el pobre e indigente." La institución de la propiedad privada debe ser "garantía de la libertad esencial de la persona y al mismo tiempo un elemento insustituible del orden de la sociedad."

    .     .     .     .     .     .     .     .

"No basta", continúa la Encíclica, "afirmar el carácter natural del derecho de propiedad privada, incluso de los bienes productivos, sino que también hay que propugnar insistentemente *su efectiva difusión* entre todas las clases sociales." (Énfasis suplido.)

(Citando de Pío XII):

"La dignidad de la persona humana exige 'normalmente, como fundamento natural para vivir, el derecho al uso de los bienes de la tierra, al cual corresponde la obligación fundamental de otorgar una propiedad privada, en cuanto sea posible, a todos' y, por otra parte, entre las exigencias que se derivan de la nobleza moral del trabajo, también se halla compren-

---

efectivamente, para todos y cada uno, los derechos esenciales" de la persona, lo cual implica que en los sistemas económicos esté permitido y facultado el libre desarrollo de las actividades de producción. Donde falta la iniciativa personal de los particulares hay estancamiento de los sectores económicos destinados a producir tanto los bienes de consumo y de servicios de las necesidades materiales, sino también los de las exigencias del espíritu. "Por otro lado, donde falta o es defectuosa la debida actuación del Estado, reina un desorden irremediable, abuso de los débiles por parte de los fuertes menos escrupulosos, que arraigan en todas las tierras y en todos los tiempos, como la cizaña entre el trigo."

dida 'la conservación y el perfeccionamiento de un orden social que haga posible una propiedad, segura, aunque sea modesta, a todas las clases del pueblo.' "

Finalmente:

"Cuanto se ha venido exponiendo no excluye, como es obvio, que también el Estado y las otras entidades públicas puedan legítimamente poseer en propiedad bienes instrumentales, especialmente cuando *llevan consigo un poder económico tal, que no es posible dejarlo en manos de personas privadas sin peligro del bien común.*' " (El énfasis es del autor.) (11)

---

(11) Castán, al decirnos que hay formulado un principio de derecho favorable al sentido social de la propiedad, comenta que se exagera bastante el carácter rígidamente individualista de la propiedad en el derecho romano, ya que según anota Stolfi, existieron en él interesantes limitaciones y prohibiciones fundadas en el *interés público*, y si faltaban las que la moderna civilización ha ido introduciendo se debe a que en aquellos tiempos no habían aparecido las necesidades que las nuevas invenciones y la gran industria han suscitado en nuestros días.

Citándonos de Stolfi, *Diritto civile*, Vol. II, pág. 221:

"Después de la guerra europea el cambio efectuado en las condiciones de vida y de espíritu de los pueblos ha hecho aparecer *ilógica e injusta* la larga protección que la ley concedía al propietario. Verdaderamente, repugna al sentimiento general que el propietario de la tierra pueda cultivarla de flores o *dejarla por capricho inculta*, cuando la nación tiene necesidad de pan o de otros artículos indispensables para la vida; que los aldeanos puedan ser echados de la tierra que han fecundado con su sudor, porque el arrendamiento haya cumplido su término y no quieran estar sujetos a las odiosas pretensiones de los propietarios; que los cientos de millares de ciudadanos de la populosa ciudad deban depender de unos pocos centenares de propietarios, para la satisfacción de una de las necesidades más esenciales de la vida, *cual es la casa*, a la que son conexas también la *libertad de locomoción, de trabajo*, etc. Las nuevas y acrecentadas necesidades individuales han mostrado en su profunda gravedad estos formidables problemas, que antes no se habían apenas exteriorizado." (Énfasis nuestro.)

Y de *"Principes d' Economie politique,"* T. II, pág. 414 y ss. nos cita Castán de Schmoller:

"Todo desenvolvimiento superior de la individualidad supone el desenvolvimiento superior asegurado, de una cierta esfera individual de libertad y, por consiguiente, de propiedad. Pero, al mismo tiempo, toda constitución superior del Estado y de la sociedad implica una *propiedad común y ciertos derechos de la comunidad sobre la propiedad individual.* Las épocas de gran progreso social, de cohesión creciente de fuerzas, son al

En España, el concepto social de la propiedad privada para beneficio común ha echado profundas raíces. Comenta Castán, op. cit., pág. 100, que la concepción individualista de la propiedad privada como un derecho ilimitado sobre la cosa está hoy enteramente desacreditada. Se estima que debe ser considerada "como un derecho *subjetivo* al que va ligada una *función social*."

En las leyes fundamentales del Estado Español, la propiedad privada queda reconocida y amparada por el Estado —Fuero de los Españoles, Art. 30—pero el Estado asume la tarea de multiplicar y hacer asequibles *a todos los españoles* las formas de propiedad ligadas *vitalmente* a la persona humana, el *hogar familiar*, la heredad de tierra y los instrumentos o bienes de trabajo para uso cotidiano—Fuero del Trabajo, decl. 12. Todas las formas de la propiedad *quedan subordinadas al interés supremo de la Nación*, cuyo *intérprete* es el Estado, o lo que es igual, "a las necesidades de la Nación y al bien común"—Fuero de los Españoles, Art. 30. La ley fundamental de Principios del Movimiento de 1958 acoge la anterior orientación pero *acentúa la finalidad social* del derecho de propiedad, al declarar que reconoce "a la propiedad privada en todas sus formas, como derecho *condicionado* a su función social." Op. cit., pág. 91.

Observa Don José Castán que ya no bastan las formas clásicas del *"impuesto"* o de la *"expropiación"*, sino que la reconciliación del derecho de propiedad con las exigencias del bienestar común exige determinar qué cosas pueden ser entregadas al control individual, sobre todo en aquellos sectores

---

mismo tiempo las épocas en las que *se multiplica la propiedad común,* no solamente la del Estado, sino la de los órganos sociales más considerables, *acentuándose la subordinación* de la vida individual *a los fines colectivos." Derecho Civil Español, Común y Foral,* 10a. ed., 1964, Tomo II, Vol. 1, págs. 92, 93, 94.

Y véase: *"La Propiedad y sus Problemas Actuales",* 2a. ed., Instituto Editorial Reus, 1963, Ponencia leída por Don José Castán en la Solemne Apertura de los Tribunales celebrada el 15 de septiembre de 1962.

económicos vitales para la humanidad; y exige el hacer que penetre el *elemento social* en la propiedad individual, no sólo en cuanto a señalar límites a la extensión y ejercicio del derecho de propiedad, sino también imponiendo al propietario aquellas obligaciones y responsabilidades que demande el interés general, consecuencia de la culpa del propietario o de la noción de riesgo. Entre las muchas soluciones concretas en que plasma la actual orientación socializadora del derecho de propiedad, señala:

(ii) Favorecer la expansión y *resurrección* de los tipos de *propiedad común o colectiva,* así como la *explotación por el Estado o por el Municipio* de ciertas industrias importantes y de los servicios públicos ....

(iii) Limitar el ejercicio del derecho de propiedad, evitando que se haga de él un uso antieconómico o irracional ....

(v) Limitar las facultades de *gozar* y *disponer,* y el contenido entero del derecho del propiedad, desenvolviendo ampliamente los derechos *de la colectividad y del Estado* ....

(vi) Desenvolver el principio y aplicaciones de la "expropiación forzosa", haciéndola extensiva a ciertos bienes muebles, y *ampliando las causas que pueden motivarla respecto a los inmuebles,* introduciendo al lado de la expropiación clásica para obras o construcciones de utilidad pública, la expropiación por causa de bonificaciones y mejoras agrarias u otras industriales y en *interés social.* Op. cit. págs. 102–104. ([12])

[12] El Estado Español tiene una comprensiva ley de expropiación forzosa, cual es la Ley de 16 de diciembre de 1954. Dispone la expropiación forzosa por causa de utilidad pública "o de interés social." Además del Estado—Art. 2—podrán ser beneficiarios de la expropiación forzosa por causa de utilidad pública las entidades y concesionarios a los que se les reconozca legalmente esta condición y, *"por causa de interés social",* podrá ser beneficiario, aparte de las antes indicadas, *cualquier persona* natural o jurídica en la que concurran los requisitos señalados por la Ley especial necesaria a estos efectos.

El Art. 10 declara que la utilidad pública, en cuanto a la expropiación de inmuebles, se entiende *"implícita"* en todos los "planes de obras y servicios del Estado, Provincia y Municipio."

Según el Art. 71, existe causa de *interés social* para la expropiación forzosa en adición a los casos en que haya lugar con arreglo a las leyes, *"cuando con esta estimación expresa se haya declarado específicamente por una Ley* la oportunidad de que un bien o una clase de bienes se utilicen

534

Acorde con los fundamentos de propiedad social cristianos que anteceden, nuestra Constitución reconoce como un derecho fundamental del ser humano, el derecho al disfrute de la propiedad. Art. II, Sec. 7.

Pero nuestro País no se ha quedado atrás en el pensamiento moderno de la utilidad social de toda la propiedad,

en el sentido positivo de una determinada función social y el propietario incumpla esta directiva."

El Art. 76 permite la expropiación de bienes *muebles* o *inmuebles*, de valor artístico, histórico o arqueológico. (En caso de estos bienes artísticos o históricos el precio de los bienes se fija por Académicos, uno de ellos en representación del propietario. Art. 78.)

El Art. 82 permite la expropiación de edificios y terrenos que impidan la contemplación de monumentos histórico-artísticos, constituyan causa de cualquier perjuicio para ellos, y cuantos puedan destruir o aminorar *la belleza* o seguridad de los *conjuntos de interés histórico-artístico.*

El Art. 85 y los siguientes permiten la expropiación por razones de urbanismo. Según el 86, cuando fuere preciso expropiar las tierras que sirvan de base principal de sustento a todas o a la mayor parte de las familias de un Municipio o de una Entidad local menor, el Consejo de Ministros acordará el *traslado de la población.* El 97 la permite por causa de "colonización" y de fincas mejorables.

Siempre que el *interés general aconseje la difusión de un invento* o su uso exclusivo por parte del Estado, el Art. 99 permite la expropiación de la *patente.* También se declaran expropiables las restantes modalidades de la propiedad industrial.

La ley permite la expropiación de la ocupación temporal, Arts. 108 y ss.

En concordancia con lo anterior, véanse la Ley de Ayuntamientos de 24 de junio de 1955; la Ley sobre Régimen del Suelo y Ordenación Urbana, de 12 de mayo de 1956; Planeamiento Urbanístico, Régimen Urbanístico del Suelo, Ejecución de Planes de Urbanismo; la Ley de 17 de julio de 1945 sobre expropiación forzosa para las instituciones *privadas* benéfico-docentes. Ley de 27 de abril de 1946 sobre expropiación forzosa de fincas rústicas de *interés social*:—Colonización; Decreto de 10 de agosto de 1955 sobre *concentración parcelaria*; Decreto de 12 de junio de 1953 sobre Comercio de objetos histórico-artísticos; Ley de 24 de octubre de 1939, declarando de interés nacional una industria para estimular la iniciativa particular para su implantación; Ley de 15 de julio de 1954 sobre protección a la vivienda de renta limitada, y los respectivos reglamentos y decretos para implantar estas leyes.

Véanse Sentencias del Tribunal Supremo de España de 3 de enero de 1953 (Aranzadi: Núm. 102); 4 de julio de 1957; 10 de octubre de 1957; 10 de febrero de 1930 y 5 de diciembre de 1931 (sobre bienes artísticos o históricos); 20 de marzo de 1952 (colonización).

pública y privada, que ha de servir primeramente al interés y al bien común. En muchos aspectos de esa utilidad social, nuestro Pueblo se ha anticipado, o ha penetrado más profundamente, a como ha ocurrido en otros pueblos. Basta mirar la legislación vigente en nuestros estatutos y códigos.

Si bien es cierto que nuestra Ley de Expropiación Forzosa de 1903 aún se manifiesta en términos de expropiar por razón de "utilidad pública" y enumera una serie de obras, Sec. 2, —véase Sec. 3(a)— no es menos cierto que en 1946, y por la Ley Núm. 300 de abril 12, la Asamblea Legislativa enmendó por primera vez el Art. 282 del Código Civil de 1902 para leer:

En un Preámbulo a la Ley de Expropiación de 16 de diciembre de 1954, expresa Rodríguez Moro:

"Desde 1879 no es exagerado afirmar que las bases políticas, sociales, económicas y de toda otra índole, condicionantes de la acción de Gobierno, han experimentado desplazamientos tan significativos, que todas las instituciones del Derecho Administrativo clásico, aun sin resultar deformadas en su esquema técnico, han tenido que ser readaptadas convenientemente, a fin de poder operar con ellas como medios idóneos al servicio de una acción administrativa de signo e intensidad muy diferentes a los que se consideraron óptimos en la época en que surgió. Con respecto a la *expropiación*, esto viene a ser tanto más apremiante precisamente por cuanto por definición en el grado que significa un considerable sacrificio del interés privado, resulta el punto donde inmediatamente repercuten *las crecientes exigencias del interés público*.

Sobre el radio de acción que a la expropiación fijaba el orden político liberal, ha venido a actuar, en primer término, el principio que expresa la *conciencia social* del nuevo Estado. . . . Al consagrar la *expropiación por interés social*, la ley fundamental viene a incorporar jurídicamente una concepción que, habiendo superado *el agrio individualismo* del sistema jurídico de la propiedad privada de la economía liberal, viene a entender *implícita*, tras toda relación de dominio, una *función social de la propiedad*. Consecuentemente, la *expropiación* tiene ahora que ser configurada desde esta nueva persepectiva, a fin de brindar a la Administración *medio aptos* para hacer efectivo el principio contenido en el estatuto fundamental de derechos y deberes de los españoles." (Énfasis suplido.) Nemesio Rodríguez Moro: *La Expropiación Forzosa*, Instituto de Estudios Políticos, Madrid, 1958.

Consúltense también: García De Enterria: *Los Principios de la Nueva Ley de Expropiación Forzosa*, Instituto de Estudios Políticos, Madrid, 1956; Alberto Almazor y Julio Rafels: *Expropiación Forzosa y Urbanismo*, Barcelona, 1959.

536

"Nadie podrá ser privado de su propiedad sino por autoridad competente, por causa justificada de utilidad pública *o beneficio social,* y mediante el pago de una justa compensación que se fijará en forma provista por ley." (Énfasis nuestro.)

En la enmienda se intercaló la frase enfatizada "o beneficio social." ([13])

En la Constitución del Estado Libre Asociado de Puerto Rico se dispone en su Carta de Derechos, Art. II, Sec. 9, que no se tomará o perjudicará la propiedad privada "para uso público" a no ser mediante el pago de una justa compensación y de acuerdo con la forma provista por ley.

■ Si se consideran los criterios contemporáneos más avanzados sobre la función y deberes del Estado; el hecho casi universalmente arraigado del concepto social de la propiedad privada; la legislación social adoptada por la Asamblea Legislativa antes de la Constitución; la interpretación judicial de esa legislación; la enmienda en 1946 al Art. 282 del Código Civil hecha por legisladores que en gran número de ellos pertenecieron después a la Convención Constituyente como delegados, es preciso concluir que la frase "utilidad pública" en la Constitución del Estado Libre Asociado significa también utilidad social, interés social, bienestar común.

—V—

■ El poder de expropiación forzosa del Estado Libre Asociado es consustancial mismo con su existencia como Estado, e inseparable de su poder político. La Constitución de Puerto Rico se lo reglamenta en el sentido de que lo ejerza para utilidad pública, y como hemos concluido, beneficio e interés o utilidad social y del bien común, sujeto al pago de una justa compensación; y en el caso de una imprenta, se lo

_____

(13) Igualmente en su nuevo Código Civil de 1942, Venezuela enmendó el artículo equivalente 547 para disponer que "Nadie puede ser obligado a ceder su propiedad, ni a permitir que otros tengan uso de ella, sino por causa de utilidad pública *'o social'.* . . ."

reglamenta además en otros conceptos. *Kohl et al.* v. *United States*, 91 U.S. 367, 372; *Boom Co.* v. *Patterson*, 98 U.S. 403, 406; *United States* v. *Jones*, 109 U.S. 513, 518; *United States* v. *Carmack*, 329 U.S. 230, 236, 237; *Reter* v. *Davenport, R.I.&N.W. Ry. Co.* (Iowa), 54 N.W.2d 863, 867.

Cuando la Asamblea Legislativa misma, quien ejerce el poder de expropiación forzosa del Estado bien por sí o en forma delegada, hace ella la determinación de utilidad pública o interés público, resulta poco menos que imperceptible la facultad de los tribunales para contradecir esa determinación. Tiene que ocurrir, como dijo el Juez Holmes en *Old Dominion Co.* v. *United States*, 269 U.S. 55, 56, y se reafirmó años después en *U.S. ex rel. T.V.A.* v. *Welch*, 327 U.S. 546, 552, que la determinación legislativa equivalga a una imposibilidad o que haya inexistencia total de vínculo racional entre la declaración legislativa y el objeto perseguido.

■ Una vez que la declaración legislativa o del organismo delegado sea de utilidad pública, en el significado presente del concepto, no incumbe a las cortes intervenir con la manera y medios que la Legislatura o sus organismos delegados escogen para ejercer el poder de expropiar, ni con la selección que hace de los bienes a ser expropiados. *Berman* v. *Parker*, 348 U.S. 26, 33 y ss.; *U.S. ex rel. T.V.A.* v. *Welch*, supra; *United States* v. *Carmack*, supra, págs. 242, 243; *Adirondack Railway* v. *New York State*, 176 U.S. 335, 349; *Little* v. *Loup River Public Power Dist.* (Neb.), 36 N.W.2d 261, 265; *Pearl River Valley Water Supply District* v. *Brown* (Miss.), 156 So.2d 572, 578, *cert. denegado*, 376 U.S. 970. Véanse: *McCormick* v. *Marrero*, 64 D.P.R. 260, 267 (1944); *Municipio* v. *Junta de Planificación*, 68 D.P.R. 646, 649 (1948); *Estado* v. *Fajardo Sugar Co.*, 79 D.P.R. 321, 328 y ss. (1956); cf. *E.L.A.* v. *Aguayo*, 80 D.P.R. 552, 595 y ss. (1958); *E.L.A.* v. *Sucn. Gautier*, 81 D.P.R. 580, 591 (1959); cf. *P.R. Telephone Co.* v. *Tribl. Contribuciones*, 81 D.P.R. 982, 1005 (1960); *M. Mercado e Hijos* v. *Tribl. Superior*,

85 D.P.R. 370, 375 (1962) ; *People of Puerto Rico* v. *Eastern Sugar Associates* (1st Cir.), 156 F.2d 316, *cert. denegado*, 329 U.S. 772.

■ La Sala sentenciadora, ni la representación legal de los demandados apelados captan una utilidad o fin público porque la Administración, al hacer uso de los poderes que le concediera la Ley Núm. 13 de 1962 de modo que hiciera valer los propósitos del estatuto, no señaló una obra específica: una escuela, edificio gubernamental, puente, carretera o vía pública, un parque, etc. a ser realizada en los bienes expropiados.

■ Como fundamento para declarar sin lugar la demanda por no existir "necesidad pública alguna que justifique la adquisición por el Estado de los bienes propiedad de los demandados", concluyó la Sala que no se expropiaba "para un uso público específico" y sí, "para los fines y propósitos generales que enmarca la ley de la Administración." La inferencia es inevitable: La Sala entendía que los propósitos generales de la Ley Núm. 13 de 1962 y sus fines no son de utilidad pública.

El error estriba en que se perdió de vista que la tierra de los demandados no se expropia como parte de un mecanismo para proveerle un *situs* o fundo a una obra específica. Para este fin, era innecesaria la Ley Núm. 13. El Estado podía expropiarla bajo la legislación ordinaria.

Se perdió de vista que en este caso es la *tierra misma* la fuente y el objeto a la vez del mal o del problema socioeconómico que la Asamblea Legislativa quiso encarar con esta legislación, y con la creación de la Administración de Terrenos.

Aun cuando la doctrina fuera en todo sentido en contrario, y los tribunales tuviéramos la manga ancha para enjuiciar y contradecir el criterio legislativo sobre utilidad y necesidad públicas, en el supuesto, repetimos, de que nos correspondiera tal función, ante los hechos en el récord, el

criterio judicial no podría ser sino de plena concurrencia en el juicio legislativo.

Nuestros jueces, al igual que nuestros funcionarios ejecutivos y legislativos, al igual que el más humilde de los ciudadanos en la comunidad, saben también de los problemas de concentración de seres humanos en la ciudad creciente y sus necesidades de servicios públicos y sociales; de los del tránsito y vías de comunicación; de la necesidad básica de la vivienda familiar, y del sin fin de problemas y ajustes característicos de una economía no estática.

Saben también de cómo fuerzas económicas desiguales, cuando una de ellas está en franca desventaja ante el poder de la otra, no pueden establecer, por ley de neutralización y balance, precios libres en abierta competencia, sino que viene el agiotismo, la especulación y el acaparamiento, y los precios artificialmente fijados en beneficio del especulador.

Saben que, por razón de la naturaleza humana, junto a la inversión o capital cristiano que crea fuente de riqueza y bienestar y da vida, aunque con el derecho justo a una ganancia, camina el capital especulador menos cristiano, con fines meramente egoístas en único beneficio particular.

La Sala fue de opinión, y los demandados apelados lo destacan con énfasis en sus alegatos, que la Ley Núm. 13 y sus medios y métodos no son otra cosa sino un mecanismo en manos del Estado para congelar y reglamentar el precio del terreno. Si mediante la congelación o reglamentación de precios de la tierra se produce una manera racional de resolver el problema atacado, nada hay de inconstitucional en ello. Lo mismo que si para remediar el mal la Administración de Terrenos tiene que constituirse en un traficante en tierras, aun cuando sea para mantenerlas en reserva en previsión del porvenir, y todo ello es en beneficio social, nada hay de inconstitucional en que así sea.

Como observa el Juez William O. Douglas, el Estado, si así lo desea, puede adoptar una economía socialista; aunque

para así hacerlo, debe pagar por la propiedad privada que convierta al uso público. *"The Anatomy of Liberty"*, Credo Series, pág. 87. Y véase: *Green* v. *Frazier*, 253 U.S. 233, 238 y ss.

Por las razones expuestas, habremos de concluir que:

■ i. La Ley Núm. 13 de 16 de mayo de 1962 es constitucional en todos sus aspectos, medios y maneras. Constituye un legítimo uso del poder público en protección de lo que para una comunidad de 2,712,808(*) seres humanos debatiéndose en un pequeño territorio de 3,435 millas cuadradas es su más preciado valor de supervivencia: el espacio vital.

■ ii. La creación de la Administración de Terrenos de Puerto Rico y los poderes y facultades que ejerce para hacer efectivos los fines y propósitos de la Ley Núm. 13 de 1962 son constitucionales.

■ iii. Las obras, proyectos, poderes, facultades y prerrogativas de la Administración de Terrenos de Puerto Rico creados y ejercitados para dar cumplimiento a los propósitos y fines de la Asamblea Legislativa perpetuados en la Ley Núm. 13 de 1962, son obras, proyectos, poderes, facultades y prerrogativas investidos de interés público y de beneficio social.

iv. El "Ámbito del Proyecto" del Área Metropolitana de San Juan, sometido a la Junta de Planificación por la Administración de Terrenos y aprobado por la Junta de Planificación en 23 de enero de 1963 (Plano, Anexo (*A*)) está investido de interés público y beneficio social.

■ v. Toda adquisición de terrenos por la Administración con miras a cumplir con las disposiciones de la Ley Núm. 13 de 1962 es de interés público y beneficio social, para la cual puede acudirse a la expropiación forzosa.

(*)Cifra a julio, 1967. Para 1970 se espera 2,896,873; para 1975, 3,217,816 y para 1980, 3,623,395. Datos de la Junta de Planificación.

vi. El Estado Libre Asociado tiene derecho a retener el título de dominio sobre los bienes aquí expropiados que adquirió el 5 de diciembre de 1963; y tiene derecho a entrar de inmediato en la posesión material de dichos bienes.

vii. Los demandados apelados Señores Rosso tienen derecho a la justa compensación constitucional, según dicha justa compensación sea fijada por el Poder Judicial. Cf. *Monongahela Navigation Co.* v. *United States*, 148 U.S. 312, 327; *United States* v. *New River Collieries*, 262 U.S. 341, pág. 343.

viii. En vista de que en el curso del litigio se ha hecho referencia a la capacidad económica de la Administración para satisfacer la justa compensación a que tienen derecho los demandados apelados, se declara que para el pago de dicha justa compensación según sea fijada judicialmente está empeñada la buena fe del Pueblo de Puerto Rico, y están disponibles los fondos del Tesoro público, independientemente de las asignaciones y fondos privativos con que cuente la Administración de Terrenos al momento de fijarse y ser efectiva la justa compensación.—Ley de Expropiación Forzosa de 1903, Secs. 5(a); 5(b).

*Se revocará la sentencia apelada que desestimó en los méritos la demanda de expropiación y anuló el título de propiedad adquirido por el Estado Libre Asociado el 5 de diciembre de 1963; se dictará otra declarando con lugar la demanda de expropiación sosteniendo el título de dominio adquirido por el demandante Estado Libre Asociado, y se devolverá el caso a la Sala sentenciadora para que proceda a fijar la justa compensación que los demandados tienen derecho a recibir por la expropiación de sus bienes.*

Los Jueces Asociados Señores Belaval, Hernández Matos, Blanco Lugo y Dávila, no intervinieron.

542

29 de agosto de 1962

Sr. Ramón García Santiago
Presidente
Junta de Planificación de Puerto Rico
Santurce, Puerto Rico

Estimado señor García Santiago:

La Administración de Terrenos de Puerto Rico, creada por la Ley Número 13 de 16 de mayo de 1962, respetuosamente somete a la consideración de esa Honorable Junta de Planificación la presente consulta con respecto a su proyecto de desarrollo del Area Metropolitana de San Juan, conforme a las facultades y deberes de esta Administración y a los fines de llevar a cabo los propósitos de la ley que la crea.

En la exposición de motivos de dicho estatuto entre otras cosas se declara que:

1. Terrenos con potencialidades para desarrollo urbano son acaparados y dejados sin uso por sus dueños, lo cual crea una escasez artificial de tierra y aumenta el precio de los terrenos a un ritmo mayor que el aumento de precios de otros bienes y servicios de primera necesidad.

2. El aumento en el precio de los terrenos hace imposible que las familias de escasos o medianos recursos puedan construir hogares propios en áreas adecuadas y convenientes.

3. Debido a la preferencia de la familia puertorriqueña por la vivienda individual, el aumento en el precio de los terrenos obliga a la expansión horizontal desmedida de pueblos y ciudades. Ello hace más difícil y costoso la prestación de ciertos servicios públicos esenciales.

4. El aumento en precios de los terrenos, aumenta el costo fijo en las empresas industriales y comerciales haciendo que sus productos compitan en desventaja en y fuera de Puerto Rico.

5. El aumento en el precio de los terrenos impide la implementación de los planos reguladores y constituye un grave problema en el uso adecuado de los fondos públicos.

6. En el interés público debe evitarse lo antes posible el desmedido y desproporcional aumento en el precio de las tierras.

7. El encarecimiento desmedido de los terrenos hace más costosos y obstaculiza dos tipos de obras públicas, fundamentales al desarrollo y bienestar de los residentes de Puerto Rico: Vías de comunicación y viviendas públicas.

La ley declara, además, que es la intención de la Asamblea Legislativa el que la Administración promueva, en forma planificada y eficiente el bienestar, la libertad económica y la justicia social de los actuales y futuros habitantes de Puerto Rico, mediante la adquisición, habilitación y uso eficiente de nuevas áreas en cualquier parte de Puerto Rico. De este modo se podrá asegurar el mejor equilibrio en cuanto a las necesidades de las futuras comunidades, en armonía con el medio económico y geográfico; se preservarán los valores históricos y los valores naturales de la tierra, las playas, bosques y paisajes; se asegurarán las mejores condiciones de salubridad, seguridad y comunidad, mayores facilidades recreativas y mayores y mejores servicios esenciales; se evitará la concentración de terrenos, para fines especulativos en manos de cualquier persona; y se encauzará todo tipo de proyecto, por parte de la Administración, conjuntamente con agencias estatales o federales, gobierno municipal o con entidades privadas.

En síntesis, esto promoverá aquellas acciones encaminadas a la mejor utilización y aprovechamiento de los terrenos a base de costos más razonables en beneficio del bienestar de la comunidad, especialmente en las poblaciones y en las zonas de potencial desarrollo urbano, creando reservas adecuadas de terrenos para ayudar en esta forma al Estado Libre Asociado de Puerto Rico a realizar su política pública de desa-

rrollo industrial, comercial y de hogares, a proveer servicios públicos de modo que haya un desarrollo ordenado en armonía con los planos reguladores, y a llevar a cabo más efectivamente su responsabilidad gubernamental de mantener la salud, la seguridad y el bienestar de los habitantes de Puerto Rico en el nivel más alto compatible con los recursos de la comunidad.

Asimismo, la ley le confiere los poderes y derechos necesarios para que esta Administración lleve a cabo sin exclusión de otras actividades inherentes las siguientes:

1. Adquirir cualquier derecho, interés o servidumbre en cualquier propiedad que propicie el desarrollo, aprovechamiento y conservación de áreas abiertas en su estado natural, para proteger los cuerpos de agua, conservar los suelos y bosques, preservar la belleza de los parajes destinados a uso del público, proteger al público del efecto de las inundaciones, y facilitar el uso y desarrollo de áreas reservadas para proyectos de interés público y especialmente aquellos relacionados con la salud, la seguridad y el bienestar de los habitantes.

2. Disponer de la parte que sea necesaria de su propiedad inmueble, estableciendo, al así hacerlo, las condiciones o limitaciones, en cuanto a su uso y aprovechamiento, que considere necesarias y convenientes.

3. Asegurar el cumplimiento de los propósitos de esta ley y evitar que el destino que se le dé a dicha propiedad pueda facilitar o propender a crear o mantener condiciones indeseables o adversas al interés del público.

4. La Administración de Terrenos podrá imponer aquellas restricciones, cuando venda o de cualquier otro modo disponga de su propiedad, que limiten las ganancias que, en el precio a pagarse por el público habrá de tener el adquirente respecto del terreno y de todo otro costo del proyecto.

5. Desarrollar proyectos de rehabilitación de terrenos mediante desecación, desagüe, relleno, regadío o cualquier otro método adecuado para aumentar la utilización de terrenos.

Esta Administración de Terrenos ha realizado un estudio de los factores poblacionales, económicos y de uso de terrenos en el Area Metropolitana de San Juan. A base de los mismos ha preparado una proyección del probable crecimiento hasta el año 1980 con el propósito de determinar la necesidad de terrenos para propiciar el desarrollo anticipado.

A continuación ofrecemos los datos básicos de dicho estudio:

En la pasada década el Area Metropolitana de San Juan (incluye los municipios de San Juan, Bayamón, Cataño, Guaynabo, Trujillo Alto y Carolina) absorbió todo el crecimiento poblacional que tuvo Puerto Rico. Es decir, de una población de 509,000 que tenía en 1950 ha aumentado a 648,000 en 1960. Ese crecimiento poblacional se alcanzó en una década en que la migración de Puerto Rico hacia el exterior fue sustancial. Se anticipa por los organismos concernidos que la migración de Puerto Rico hacia el exterior será significativamente menor. Cálculos al efecto, teniendo en cuenta la reducción de la migración de Puerto Rico y las tendencias actuales de crecimiento del Area Metropolitana, señalan un crecimiento para ésta realmente considerable. Anticipando los posibles resultados en crecimiento regional equilibrado se llega a la conclusión de que el Area Metropolitana de San Juan crecerá probablemente de 648,000 en 1960 a 863,000 en 1970 y a 1,112,000 en 1980.

Aunque el crecimiento demográfico es uno de los principales determinantes de la demanda de vivienda, es necesario considerar también el crecimiento económico puesto que la familia que aspira a poseer una nueva casa deberá tener la capacidad económica para adquirirla. Este crecimiento demográfico estará acompañado por un crecimiento rápido de los ingresos de las familias. En el Area Metropolitana de San Juan se espera que el número de empleos crezca de 180,000 en 1960 a 254,000 en 1970 y a 326,000 en 1980.

La significación de este crecimiento del empleo no es tanto por su aspecto cuantitativo sino por el hecho de que el aumento de estos empleos habrá de registrarse en industrias que normalmente son de alta remuneración y que utilizan mano de obra especializada. Esto quiere decir que el aumento del empleo ha de registrarse principalmente en ocupaciones tales como profesionales, técnicos, oficinistas, vendedores, etc. que son las de más alta calificación y que gozan también de mayor retribución. Del incremento total de los empleos previstos para la próxima década, el 65 por ciento tendrá lugar en la industria manufacturera y el 33 por ciento en el gobierno, actividades éstas que utilizan una gran proporción de empleos totalmente calificados.

Cálculos al efecto sobre la implicación de este crecimiento de empleo y en los ingresos de las familias demuestran que el crecimiento del número de familias con ingresos de poder adquisitivo de $3,000 habrá de ser de por lo menos 80,000 en la década de 1960 al 1970. Concretamente, se estima que en el Area Metropolitana de San Juan había en 1960 alrededor de 50,000 familias con ingresos de más de $3,000 y se estima que el número de estas familias con poder adquisitivo para comprar casas similares podría ser de 130,000 en 1970, lo que representa un aumento de 80,000. Para 1980 el número de estas familias se estima en 206,000. Muchas de estas familias que están pasando a este nivel de ingresos son familias jóvenes, de ocupaciones más bien especializadas, que habrán de ir entrando en el mercado de viviendas todos los años al querer hacerse de su propio hogar. Es significativo que en el Area Metropolitana de San Juan, el número de hogares encabezados por hombres de 20 a 25 años, es decir, por gente joven, era de 20,800 en 1960. Para 1970 se espera que este número sea ya de 42,000 y para 1980 de 47,000. Esto implica un crecimiento notable en el número de matrimonios jóvenes que habrán de requerir nuevas viviendas.

Se calcula que, puramente por factores demográficos y de formación de hogares, el número de viviendas ocupadas en el Area Metropolitana de San Juan habrá de subir de 140,000 a 201,000 entre 1960 y 1970, y para 1980 habrá 274,000.

Las cifras anteriores se refieren a viviendas ocupadas, pero en todo momento existen otras viviendas adicionales que por cuestión de movilidad de las familias y otras razones pueden estar desocupadas. Como cuestión de realidad en 1950 el número de viviendas desocupadas fue equivalente al 5 por ciento de las ocupadas. En 1960 las desocupadas eran equivalentes al 6 por ciento de las ocupadas y se estima que para 1970 y 1980, este por ciento de viviendas desocupadas pueda subir al 7 y 8 por ciento, respectivamente. Teniendo en consideración tanto las viviendas ocupadas como las desocupadas, se anticipa que el volumen total de viviendas en el Area Metropolitana de San Juan sea de 216,000 en 1970 y de 252,000 en 1975.

Los estimados indican para 1970 unas 70,000 viviendas más que en 1960 y para 1980 unas 80,000 más que en 1970. Sin embargo, estas cifras no señalan la construcción total que efectivamente habrá de realizarse en la década. El número de viviendas a construirse deberá satisfacer la demanda efectiva que se genere no sólo por el incremento del número de familias, sino también por el aumento de las que tendrán la capacidad económica para comprarlas así como por las demoliciones, y conversiones de las viviendas ya existentes.

Estudios al efecto, teniendo en consideración el crecimiento del número de familias, el crecimiento de ingresos de estas familias, la disminución de viviendas por eliminación y conversión señalan que en el Area Metropolitana de San Juan será necesario construir 80,000 viviendas privadas del tipo que se venden en el mercado actual y que entre 1970 y 1980 habrán de requerirse unas 90,000 adicionales. Es significativo que durante los tres años de 1960 a 1962 se cons-

truyeron un total de 22,700 viviendas privadas, de las cuales cerca de 8,700 corresponden al último año.

A continuación se explica como las proyecciones poblacionales y económicas se reflejan en las necesidades de terrenos:

1. *Vivienda privada*—un análisis realizado de las urbanizaciones construidas en el Area Metropolitana de San Juan durante la década anterior demostró que la densidad promedio era de poco más de 6 viviendas por cuerda. Tomando en consideración las guías adoptadas en principio por la Junta de Planificación, se ha estimado que esta densidad promedio ascienda a alrededor de 8 viviendas por cuerda. Por consiguiente, las 170,000 viviendas que se necesita construir para 1980 habrán de requerir unas 20,700 cuerdas.

2. *Vivienda pública*—para alcanzar el objetivo establecido en vivienda pública de reducir para 1970 a un 14% el número de familias residentes en las áreas a mejorarse del Area Metropolitana de San Juan será necesario construir alrededor de 16,600 unidades de vivienda pública y desarrollar unos 12,000 solares. Por lo menos igual número de viviendas y solares sería necesario proveer entre 1970 y 1980. Este total de 57,300 unidades de viviendas y solares requerirá unas 4,000 cuerdas.

3. *Uso industrial*—para 1970 se estima un nivel de 44,000 empleos en la manufactura en el Area Metropolitana de San Juan, lo que supone un aumento de 17,000 empleos. Para la década entre 1970 y 1980 se espera un aumento de otros 17,000 empleos. El total de 34,000 empleos requerirá alrededor de 850 cuerdas.

4. *Otros usos*—el crecimiento económico y poblacional anticipado traerá indudablemente una mayor demanda de más y mejores servicios y utilidades públicas y el desarrollo de mayor número de proyectos por la agencia privada. Los principios de buena planificación indican que debe pensarse en una adecuada utilización y disposición de los terrenos. Para atender los requerimientos que esta demanda impone

en términos de terreno será necesario disponer de otras 3,170 cuerdas para continuar ininterrumpidamente la construcción de carreteras, hoteles, facilidades comerciales, balnearios y parques, hospitales, oficinas gubernamentales y otros proyectos de diversas índoles.

5. *Necesidades totales*—el análisis realizado sobre la demanda de terrenos para los distintos usos y facilidades de la comunidad hasta 1980 demuestra que, en el Area Metropolitana de San Juan, serán necesarias alrededor de 28,720 cuerdas para las siguientes actividades públicas y privadas:

| *Uso* | *Cuerdas* |
|---|---|
| Industria, turismo y comercio | 1,030 |
| Educativas e institucionales | 580 |
| Recreativas | 600 |
| Médico-hospitalarias | 200 |
| Transportación y comunicación | 910 |
| Vivienda | 24,700 |
| Oficinas gubernamentales | 460 |
| Otras | 240 |
| Total | 28,720 |

De este total de 28,720 cuerdas, se estima que alrededor de 3,000 cuerdas se desarrollaron entre 1960 y 1962. Por consiguiente, el número de cuerdas netas necesarias hasta 1980 sería de alrededor de 25,720. Los datos anteriores señalan que el extraordinario crecimiento que se experimentó en la década pasada habrá de prevalecer.

Durante la década de 1950 al 1960 se urbanizaron un total de 10,000 cuerdas en el Area Metropolitana de San Juan, que en su mayoría correspondieron a vivienda privada y pública y a proyectos públicos. Las cifras anteriores señalan un promedio de poco más de 14,000 cuerdas que habrán de urbanizarse en cada una de las décadas de 1960 a 1970 y de 1970 a 1980.

A tenor con los datos ofrecidos anteriormente esta Administración de Terrenos solicita de esa Honorable Junta de Planificación la aprobación al descrito programa de desarrollo integral del Area Metropolitana de San Juan y específicamente que apruebe el ámbito del proyecto de adquisición de terrenos (scope of the project) conforme al plano que se acompaña. El mismo describe gráficamente el ámbito geográfico del proyecto de adquisición de terrenos en el área indicada, en la cual la Administración se propone, en sentido particular, realizar obras de carácter público o llevar a cabo otros programas afines con la Ley de Administración de Terrenos de Puerto Rico y, como proyecto integral, habilitar nuevas áreas para el desarrollo urbano del Area Metropolitana dentro de condiciones que aseguren el mejor equilibrio en cuanto a las necesidades de las futuras comunidades del área, tomando en consideración las normas dictadas por nuestro estatuto orgánico, especialmente en su Artículo 7(t), para asegurar en dicha área las mejores condiciones de salubridad, seguridad, comodidad, facilidades recreativas y otros servicios esenciales. Todo ello se proyecta de manera que puedan encauzarse los proyectos de desarrollo en esta zona en forma tal que los mismos propicien la utilización de los terrenos que se indican en el plano en una forma planificada y eficiente.

Cordialmente,

(Fdo.) Félix Mejías
*Director Ejecutivo*

Anexo
JRV/ammg

CERTIFICO que la anterior consulta es una copia fiel y exacta del original enviado a la Junta de Planificación de Puerto Rico.

(Fdo.) José C. Ramos Vázquez
*Consultor Jurídico*

ESTADO LIBRE ASOCIADO DE PUERTO RICO
ADMINISTRACION DE TERRENOS DE PUERTO RICO

CERTIFICO: Que esta es copia fiel y exacta
del documento original.

San Juan, Puerto Rico
a 23 de enero de 1963

_(SECRETARIO)_

ADMINISTRACION DE TERRENOS DE PUERTO RICO

AMBITO DEL PROYECTO DE
ADQUISICION DE TERRENOS
PARA EL AREA METROPOLITANA
DE SAN JUAN-29 DE AGOSTO DE 1962