EL ESTADO LIBRE ASOCIADO DE PUERTO RICO, ETC., demandante y recurrido, *v.* JOSÉ LUIS PÉREZ y su esposa EVANGELINA LÓPEZ RODRÍGUEZ, demandados y recurrentes.

*Número:* R-68-238 *Resuelto:* 10 de marzo de 1970

Clemente Pérez Martínez, abogado de los recurrentes; Rafael A. Rivera Cruz, Procurador General, J. F. Rodríguez Rivera, Procurador General Interino, Peter Ortiz, Procurador General Interino, y Dolores Ruiz de Zambrana, Procuradora General Auxiliar, abogados del recurrido; Lino J. Saldaña, Amicus Curiae.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

En 30 de septiembre de 1965 el Estado Libre Asociado interpuso demanda de expropiación y obtuvo el título de una parcela de terreno de 5,914.57 m/c según mensura (6,126.78

m/c según el Registro) sita en Martín Peña, colindando por el Norte con la Oficina de Transporte del Estado Libre Asociado; por el Sur con la Avenida Barbosa; por el Este con terrenos de Concepción Viera y por el Oeste con terrenos de Badrena y Pérez, Inc. Depositó el Estado una compensación de $328,234.20 a favor de los recurrentes José Luis Pérez y su esposa Evangelina López Rodríguez en concepto de dueños. Después de varios incidentes propios de este tipo de procedimientos, el caso se vio en los méritos para fijar en definitiva la justa compensación que correspondía a los dueños recurrentes.

En 22 de agosto de 1968 la Sala de instancia dictó sentencia con los siguientes pronunciamientos de hecho:

"1.—Con motivo de la resolución de este Tribunal en las reclamaciones de los arrendatarios David Juarbe Rosado y Castillo Auto Sales, Inc., el Estado practicó en este caso una revisión de su valoración original, la cual realizó el perito Jacinto Matías González, en la forma siguiente:

El área expropiada de 5,914.57 metros cuadrados fue dividida en dos porciones, a saber: una con cabida de 3,863.00 metros cuadrados que valoró a razón de $70.00 el metro cuadrado, dando un total de $270,410.00. La otra porción con cabida de 2,051.57 metros cuadrados la valoró a razón de $15.00 por metro cuadrado, lo que dio un total de $30,773.55. A esta última suma se le adicionaron intereses al 6% anual a contar del 8 de junio de 1948 hasta el día 30 de septiembre de 1965, fecha en que quedó investido en el Estado el título de dominio sobre el inmueble. Adicionados los intereses, la compensación por esta segunda porción quedó en $65,101.45. Sumadas las compensaciones por ambas porciones ello arrojó un total de $335,511.45, de cuya cantidad el perito del demandante descontó la suma de $20,640.00 que había sido pagada por el Estado a los arrendatarios David Jurbe Rosado y Castillo Auto Sales, Inc. Además descontó la suma de $6,000.00 por gastos en que se incurría para destruir las edificaciones y dejar limpio los terrenos, habiendo acreditado cierto valor de salvamento a las estructuras a favor del demandado por la suma de $1,665.00. Esta operación

dejó como valor de los terrenos la suma de $310,536.45 que fue finalmente ajustada por el tasador del demandante a $310,600.00.

2.—El área de 2,051.57 metros cuadrados tasada a $15.00 el metro cuadrado y sobre cuyo valor se adicionaron intereses, comprende la porción de terreno que había quedado delineada dentro del Mapa Oficial de Carreteras, aprobado el 8 de junio de 198 por la Junta de Planificación para la ampliación de la Avenida Franklin D. Roosevelt, cuyo plano recibió la aprobación del Honorable Gobernador de Puerto Rico.

3.—La parcela de terreno expropiada formaba un sólo cuerpo con frente a la Avenida Barbosa y como antes se ha indicado, en la misma enclavaban varias estructuras, a las cuales los peritos de ambas partes no le dieron valor por no responder las mismas a la mejor utilización de los terrenos.

4.—El demandado José Luis Pérez adquirió el inmueble el 15 de junio de 1956 por escritura pública número 79, otorgada ante el Notario Público Rafael Martínez Álvarez. La cabida original de la finca a la fecha de adquirirla el demandado era de 6,661.63 metros cuadrados y éste segregó y vendió 534.85 metros cuadrados el 27 de noviembre de 1957; sin embargo la mensura practicada por el demandante arrojó un área de 5,914.57 metros cuadrados.

5.—A la fecha de la expropiación las estructuras enclavadas en los terrenos expropiados y parte de los terrenos donde no existían estructuras, estaban arrendados a distintas personas, conforme aparece del Exhibit A de la demanda.

6.—A la luz de los informes de ambos peritos, las partes convinieron en que la parcela con cabida de 3,863.00 metros cuadrados, que no había sido afectada por el Mapa Oficial de Carreteras, tenía un valor de $77.00 por metro cuadrado, lo que arrojaba un total de $297,451.00.

7.—En lo referente al valor de la parcela con cabida de 2,051.57 metros cuadrados, afectada por el Mapa Oficial de Carreteras, el demandante sostuvo que su valor tenía que fijarse al 8 de junio de 1948, fecha en que entró en vigor el referido Mapa Oficial. Por el contrario, la parte demandada alegó que el valor de dicha porción era aquel que tenía a la fecha de radicarse el procedimiento, o sea, al 30 de septiembre de 1965 y que su valor por metro cuadrado era el mismo fijado a la porción no

afectada por el Mapa Oficial. El Tribunal convino en este aspecto con la posición del demandante y fijó el valor de la porción afectada por el Mapa Oficial en la suma de $66,913.00, o sea, un valor por metro cuadrado de aproximadamente $16.00, más intereses al 6% anual desde la vigencia del Mapa Oficial hasta la fecha de la expropiación.

8.—La compensación total fijada por el inmueble asciende a la cantidad de $364,364.00, suma ésta que comprende la cantidad de $20,640.00 que indebidamente descontó el perito del Estado en su revisión de la valoración."

El recurso ante nos impugna la determinación de la Sala que aceptó la revisión administrativa hecha por el Estado de la valoración original de la propiedad, y le fijó a 2,051.57 m/c, de los 5,914.57 que tiene la finca expropiada, una compensación a base del valor en el mercado en 8 de junio de 1948 cuando entró en vigor el Mapa Oficial de Carreteras, y no a base del valor en el mercado al 30 de septiembre de 1965 cuando el Estado expropió y adquirió título.

La sentencia recurrida no puede prevalecer. Nada hay en los autos que demuestre, ni tampoco hay conclusión de hecho a tal efecto, que la porción de 2,051.57 m/c fuera inferior en valor por otras razones, a los 3,863 m/c restantes de la finca. Las partes aceptaron un valor de $70 para estos 3,863 m/c y nada hay en el récord que demuestre que ese no sería también el valor para la porción de 2,051.57 m/c de haberse fijado una justa compensación al 30 de septiembre de 1965, y no al 8 de junio de 1948.

Sostuvo la Sala su fallo, como cuestión de derecho, fundamentándolo en que esta porción quedó desde el 8 de junio de 1948 *"absolutamente fuera del mercado de los hombres"*, y que por lo tanto "la dueña no podía cederla, venderla o en alguna forma traspasarla sino al Estado Libre Asociado de Puerto Rico." En apoyo de esa conclusión citó *Euclid* v. *Ambler Realty Co.*, 272 U.S. 365; *Zayas* v. *Junta de Planificación*, 69 D.P.R. 30, 37 (1948); *Municipio* v. *Junta de Plani-*

*ficación,* 68 D.P.R. 646 (1948), y lo dispuesto en el Art. 11 de la Ley de 12 de mayo de 1942.

Dejando a un lado la cuestión de derecho de que la inclusión de una propiedad en el Mapa Oficial de Carreteras no surte el efecto jurídico que le atribuye la Sala según analizaremos más adelante, la Sala concluyó, como cuestión de *hecho,* que los recurrentes adquirieron esta propiedad el 15 de junio de 1956, e inscribieron el dominio en el Registro a su favor, o sea, con posterioridad a la vigencia del Mapa Oficial. Luego, como cuestión de hecho, la propiedad estaba en el comercio de los hombres y había un mercado para ella.

Contestando comunicaciones del recurrente de 5 y 8 de marzo de 1965 para que fijaran la parte de la finca que habría de ser ocupada por la avenida a construirse, en 30 de marzo de 1965, sólo 5 meses antes de la expropiación, el Departamento de Obras Públicas le informaba que el diseño del proyecto estaba en etapa preliminar, y era *imposible* determinar a esa fecha, 30 de marzo de 1965, "la forma que sería afectada su propiedad a los fines de deslindar la parte que tendríamos que adquirir." En carta posterior de 20 de abril de 1965, el Departamento informa al recurrente que el caso aun estaba bajo estudio en el Negociado de Diseño.

En cartas de 5 de mayo y 22 de julio de 1965 el Departamento informa al dueño que sería necesario expropiar *toda* la finca, según los planos para la extensión de la Avenida Roosevelt, y se estaba ordenando la valoración de la propiedad. En carta de 16 de septiembre de 1965 el Departamento de Obras Públicas comunica al recurrente que se adquiría la parcela total de 5,914.57 m/c y ofrecían un precio o compensación de $328,234.20.

Hasta ese momento, y al iniciar la expropiación y obtener título en 30 de septiembre de 1965, el Estado no hacía diferencia entre el predio de 2,051.57 m/c y el remanente de 3,863 m/c en cuanto a valoración. El récord no contiene evidencia

contraria a lo que demuestran esas cartas, de en qué momento estos 2,051.57 m/c quedaron sujetos a las restricciones del Mapa Oficial de Carreteras, asumiendo que, como cuestión de derecho, fuera correcto que tales restricciones sacaban la propiedad del mercado a los efectos de una justa compensación constitucional.

La Ley de Planificación y Presupuesto de Puerto Rico, Ley Núm. 213 de 12 de mayo de 1942, dispuso en su Art. 11 que la Junta de Planificación podría hacer, o solicitar del Departamento de Obras Públicas que preparara, un plano o planos indicando la posición *exacta* de los trazados de las futuras carreteras y calles; y que dicho plano o planos contendrían los trazados para establecer con *exactitud* las líneas de carreteras y calles nuevas, ampliadas o ensanchadas, de Puerto Rico. Que una vez aprobados por la Junta y firmados por el Gobernador, tendrían fuerza de ley. De la misma manera la Junta establecería un Mapa Oficial. En dicho Mapa Oficial se indicarían: (a) todas las carreteras y calles existentes y declaradas por ley como carreteras y calles públicas en la fecha de adopción del Mapa Oficial y, (b) la posición de toda carretera o calle que figure en los planos de inscripción registrados, aprobados por la Junta, las cuales se considerarían a los efectos de uso y dedicación como calles públicas.

Dispuso además el Art. 11 expresamente lo siguiente:

"En el mapa oficial se indicará: ...

Todo mapa del trazado de carreteras y calles firmado por el Gobernador de acuerdo con las disposiciones de esta sección y de la sec. 19 de este título. *La preparación o adopción de cualquiera de tales mapas, o la adopción de un mapa oficial, no determinará de por sí la construcción de ninguna carretera o calle, ni la expropiación o aceptación de terrenos para tales fines de carreteras o calles.*"[1] (Bastardillas nuestras.)

---

[1] La enmienda hecha al Art. 11 por la Ley Núm. 116 de 29 de junio de 1964 no alteró en nada la disposición transcrita.

En el Reglamento de Planificación Núm. 4 promulgado por el Gobernador en 22 de mayo de 1946, Boletín Administrativo Núm. 986, se define el Mapa Oficial como "Plano o planos que indican la posición *exacta* de los trazados de carreteras y calles, según se establece en el Artículo 11 de la Ley Núm. 213 de 1942."

En el Art. 9 de este Reglamento se provee para los casos de apelaciones "especiales" ante la Junta de Apelaciones sobre Construcciones creada por la Ley, y se estatuye que tales apelaciones *"especiales"* son aquellas que surgen por motivo de perjuicios causados por circunstancias especiales extraordinarias, y quedó autorizada la Junta de Apelaciones para permitir variaciones en los requisitos del Reglamento debido a circunstancias extraordinarias o restricciones irrazonables del uso de una pertenencia, y cuando se demuestre que la concesión de tales variaciones aliviaría un perjuicio claramente demostrable "que es casi una confiscación."

Se dispuso entonces que se consideraría como apelación *"especial"* aquella en que se solicitaba la expedición o denegación de un permiso *de edificación o uso* de una pertenencia cuando ésta quedaba situada enteramente o en parte dentro de las líneas de carreteras o calles incluidas en un Mapa Oficial, o en un Distrito 'P' " y podría conceder variaciones a dichas restricciones si con ellas se aliviaba un perjuicio claramente demostrable que fuera casi una confiscación.

En el Art. 11 de este Reglamento Núm. 4 se dispuso que "En el caso de estructuras a erigirse, alterarse o trasladarse bajo *un permiso especial* dentro de las líneas de una calle que haya sido incluida en un Mapa Oficial, o dentro de un Distrito 'P', las condiciones impuestas podrían especificar que, *en caso de adquisición, se compensaría completamente sólo por el terreno y por cualquier estructura legalmente erigida antes de la fecha de vigencia de este Reglamento, recibiendo el dueño una compensación limitada, o no recibiendo en absoluto*

*compensación,* por el edificio o estructura para *que se otorga el permiso especial.*" (Bastardillas nuestras.)

Estas disposiciones del Reglamento Núm. 4 de 1946 anteriormente transcritas fueron reafirmadas y quedaron vigentes en la revisión de dicho Reglamento de 1955—Boletín Administrativo #176, 23 R.&R.P.R. secs. 9–51 a 9–54.

En el Boletín de Divulgación Núm. 1 publicado por la Junta de Planificación en 1954, la Junta explica qué es el Mapa Oficial así, en forma de preguntas y respuestas:

"¿Qué es el Mapa Oficial?

El Mapa Oficial consiste de una serie de planos o mapas, en los cuales se establecen con exactitud los trazados de nuevas calles y/o carreteras a construirse, o de vías Públicas existentes o a ser ensanchadas, adoptadas por la Junta de Planificación como parte del Plano Regulador para el Desarrollo de Puerto Rico.

¿Desempeña el Mapa Oficial alguna función de importancia en la planificación del desarrollo urbano?

Sí, la adopción del Mapa Oficial le ofrece al gobierno y a los propietarios un guía para que ambos planeen sus construcciones a la luz de los requisitos en cuanto a derechos de vía de carreteras a construirse o ampliarse, ayudando así a planificar un buen sistema de comunicaciones urbanas que no requiera la destrucción de propiedades previamente construidas en los derechos de vía.

¿Sobre qué agencia recae la responsabilidad de velar que no se construya dentro de los derechos de vía establecidos en un Mapa Oficial?

Esa responsabilidad recae sobre el Negociado de Permisos de la Junta de Planificación, que no expedirá *permiso de construcción o de uso alguno en violación del Mapa Oficial.* De las decisiones del Negociado un propietario afectado puede apelar ante la Junta, y si no estuviese satisfecho con la determinación de ésta, ante el Tribunal Supremo de Puerto Rico.

¿Se puede enmendar el Mapa Oficial?

Sí, la Junta puede enmendar el Mapa Oficial, después de celebrar una vista pública. Pero para que una enmienda tenga efecto legal, tiene que ser firmada por el Gobernador.

¿ Es cierto que si un propietario es afectado, en parte de su solar, por el Mapa Oficial, él tiene que regalarle el terreno al Gobierno?

Eso es falso. Cualquier terreno que forme parte de un solar afectado por el Mapa Oficial, *será comprado o expropiado por el gobierno a un valor justo y razonable cuando se vaya a realizar la obra o antes si se considera conveniente.* Es solamente en el caso de nuevas lotificaciones que se le exige al urbanizador la construcción total o parcial de vías que figuren en el Plano Regulador o en el Mapa Oficial para servir a la urbanización y sus solares." (Bastardillas nuestras.)

En el Boletín de Divulgación Núm. 9, publicado por la Junta de Planificación en 1958 referente al Mapa Oficial (3ra. edición), se dice, después de hacerse mención al Plano Regulador y al Mapa Oficial, que muchas de las obras que aparecen incluidas en dichos documentos tardarán varios años en construirse, y que dentro del marco de los recursos limitados se hace prácticamente imposible allegar los fondos que serían necesarios *para adquirir inmediatamente* todos los terrenos y propiedades dentro del derecho de vía de tales obras a los fines de que pueda realizarse la construcción en el futuro. De ese hecho es, dice el Boletín, que surge la necesidad del Mapa Oficial, que constituye el procedimiento mediante el cual se establece por métodos *precisos* la línea de construcción de una calle o carretera a construirse o ensancharse en el futuro, *y se prohíbe la construcción de edificaciones privadas o gubernamentales* dentro de ese derecho de vía, "ejerciendo para ello el poder policiaco del Estado." Dice el Boletín que el Mapa Oficial preserva el derecho de vía y lo mantiene libre de construcciones para cuando se vaya a construir la carretera, y que si se permitiesen *las construcciones*, sería prohibitivo llevar a efecto, más tarde, el plano en la forma en que fuera confeccionado. Así, continúa el Boletín, el Mapa Oficial evita, además, la "pérdida social tremenda" que implica la destrucción de propiedades sin beneficio real para nadie.

Dice algo más el Boletín. Que en los casos extremos en que este procedimiento afecta una propiedad sustancialmente, la Junta de Planificación está facultada para *expedir un permiso de construcción*, aun cuando esté en conflicto con la vía pública trazada, pero puede también imponer condiciones respecto a la *propuesta edificación* que sean razonables y estén dentro del interés público.

Ampliando la información contenida en el Boletín Informativo Núm. 1 antes transcrita, continúa el Boletín Núm. 9:

"¿Por qué es necesario el Mapa Oficial?

Porque en toda comunidad bien organizada es necesario un sistema de vías de comunicación adecuado y la manera más económica y eficiente de facilitar este propósito es mediante el Mapa Oficial. Por ejemplo, las condiciones difíciles de como actualmente se desarrolla el tránsito en las Avenidas Ponce de León y Fernández Juncos en San Juan nos indica que es necesario abrir nuevas vías de comunicación en lo ya construido. En el Plano Regulador se provee la Avenida Norte y la Carretera Exprés de Martín Peña para suplir esta deficiencia. Estas vías tendrán un costo muy elevado *debido al gran número de edificaciones que hay que destruir o eliminar*. El Mapa Oficial provee para que problemas tan agudos como éste no se repitan en el futuro.

¿Cuándo se inició la preparación del Mapa Oficial?

El estudio sobre el Mapa Oficial, especialmente en lo que respecta a la técnica envuelta en la preparación del mapa, fue comenzado por la División de Cartografía de la Junta de Planificación durante el año fiscal 1943–44, pero las actividades de la preparación de los mapas en sí no se iniciaron hasta principios del año fiscal 1944–45 con fondos asignados por el Programa de Emergencia de Guerra. A partir del año fiscal 1945–46 hasta 1948–49 la Legislatura hizo asignaciones especiales todos los años para continuar estas actividades. Desde el año fiscal 1949–50 la preparación de mapas oficiales se ha continuado con los fondos asignados en el Presupuesto General de Gastos de la Junta de Planificación y actualmente está a cargo de esta función la 'Sección del Mapa Oficial', adscrita al Negociado de Urbanismo de la Junta.

¿Qué disposiciones restrictivas establece el Mapa Oficial?

Tan pronto entra en vigor un Mapa Oficial *no se puede extender ningún permiso de construcción, sanitario o de uso para ningún edificio o estructura ni para ninguna parte de los mismos,* en ningún terreno situado dentro de las líneas de la carretera o calle incluida en dicho Mapa Oficial, *excepto por autorización de la Junta de Planificación.* Un urbanizador afectado por una vía pública incluida en un Mapa Oficial viene obligado a construir la misma o parte de la misma como parte de la urbanización, en la forma que dispone el Reglamento de Lotificación.

¿Quién está encargado del cumplimiento del Mapa Oficial?

El Oficial de Permisos viene obligado por ley a *no autorizar la construcción de edificación alguna* dentro del derecho de vía de las carreteras o calles incluidas en el Mapa Oficial.

¿Significa la preparación o adopción de un Mapa Oficial que las obras han de realizarse inmediatamente?

La Ley de Planificación claramente establece que la preparación o adopción de un Mapa Oficial 'no determinará de por sí la construcción de ninguna carretera o calle, *ni la expropiación o aceptación de terreno* para tales fines de carreteras o calles.' Esto quiere decir que la preparación de un Mapa Oficial no significa, en modo alguno, que las obras vayan a comenzarse de inmediato. Es indicativo, sin embargo, de que hay planes definidos para la construcción de tal vía como parte del desarrollo del área donde la misma está localizada.

¿Cómo afecta el Mapa Oficial a los propietarios?

El Mapa Oficial da la impresión de *que congela propiedades, pero ésta no es la realidad.* Por ejemplo, en un Mapa Oficial que pasa por la ciudad, casi todos los solares tienen edificaciones ya construidas. Los dueños de las propiedades pueden disfrutar de éstas y repararlas. Cuando llegue el momento de construir la vía pública, el gobierno adquiere dichas propiedades y paga por éstas su justo valor en el mercado. En los casos de Mapas Oficiales que pasan por la zona rural, los propietarios pueden continuar utilizando el espacio de la vía pública para el uso agrícola que ellos acostumbraban darle.

En los casos de Mapas Oficiales de Calles Principales en las zonas urbanas, éstas consisten del ensanche de calles existentes y pocas edificaciones quedan afectadas en su totalidad.

¿Compra el gobierno propiedades afectadas por el Mapa Oficial con anticipación a la construcción de la vía pública?

En los *casos precarios,* en que la propiedad esté realmente congelada y que el propietario *esté sufriendo grandes trastornos financieros,* el Departamento de Obras Públicas compra estas propiedades de acuerdo con leyes que asignan fondos con este propósito."

 Tanto por el dictamen legislativo contenido en el Art. 11 de la propia Ley de Planificación como por la interpretación administrativa de la Agencia que creó encargada de administrar la Ley, expresada en Reglamentos con fuerza de ley, surge claramente una expresión de política pública al efecto de que la aprobación de un Mapa Oficial de Carreteras que afecte cierta propiedad no constituye, en el momento de la aprobación del Mapa, una expropiación forzosa por parte del Estado de la propiedad afectada, ni constituye una intención de adquirir título sobre la misma en ese momento.

 La Ley y los Reglamentos citados prueban que la política pública del Estado es todo lo contrario al fallo recurrido. Véase, además, la Ley Núm. 60 de 20 de junio de 1958 que exoneró total o parcialmente del pago de contribución territorial la propiedad afectada por un Mapa Oficial. Como se habrá visto, el Mapa Oficial va dirigido principalmente a la función de la Junta de conceder o no permiso *para construir,* de modo que no se concedan tales permisos de construcción en lugares por donde ha de pasar una vía pública, para evitar que al adquirirse el derecho de vía el día que fuere, el Estado tuviere que pagar también el valor de la construcción. Aun así, los Reglamentos permiten, como se habrá podido observar, el que se concedan permisos de construcción en tales casos sujetos a ciertas condiciones si el Mapa Oficial ha de crear en torno a una determinada propiedad una situación restrictiva irrazonable que equivalga a una confiscación.

La política pública sobre el particular ha sido y continúa siendo diáfanamente clara. Por supuesto, siempre serán los tribunales los que, ante una determinada situación de hecho, dirán en última instancia si las restricciones de un Mapa Oficial han podido tener el efecto de ser una confiscación inconstitucional de la propiedad a la luz de determinadas circunstancias. Esto último, sin embargo, presenta una situación enteramente distinta a la cuestión litigiosa ahora ante nos. No está envuelta en este pleito la razonabilidad de una restricción sobre la propiedad impuesta por el Mapa Oficial, ni si es confiscatoria de la misma, ni se pide a los tribunales que, o eliminen la restricción del Mapa Oficial o se obligue al Estado a compensar el valor adquiriendo título. En este caso el Estado ha expropiado y ha adquirido título. El único problema es el de la justa compensación constitucional por el título expropiado.

El récord ante nos no permite concluir que estos 2,051.57 m/c quedaron sujetos a un Mapa Oficial el 8 de junio de 1948. Por el contrario, las cartas y el Plano en evidencia indican otra cosa. Pero aunque se aceptara que fue así como cuestión de hecho, que quedaron sujetos a un Mapa Oficial en junio de 1948, como cuestión de derecho no sería correcto concluir que en esa fecha hubo una incautación por el Estado de los 2,051.57 m/c mediante expropiación forzosa.

Tampoco sería correcto concluir en derecho a la luz de la Ley y de los Reglamentos aplicables, que la aprobación de un Mapa Oficial destruye el derecho del propietario de disponer de su propiedad en el mercado, ya que el Mapa Oficial mismo, que tiene fuerza de ley, constituye aviso *erga omnes* de las restricciones de construcción que él impone. Véase: *Waymouth Corp.* v. *Junta Planificación*, 80 D.P.R. 619 (1958), en que dijimos (pág. 622) "El hecho de que gran parte de estos terrenos estén separados para uso público, no significa que el *derecho de propiedad* esté totalmente suspendido." (Bastardillas nuestras.)

Todo lo que existió en junio de 1948, asumiendo que los 2,051.57 m/c quedaran ya afectados, fue el ejercicio por el Estado de su poder regulador de policía. Como ejercicio de tal poder de policía, y no de expropiación, los casos de *Municipio v. Junta de Planificación*, 68 D.P.R. 646 (1948), y *Zayas v. Junta de Planificación*, 69 D.P.R. 30 (1948), ilustrativos. Igualmente ilustrativo del poder de policía es *Euclid v. Ambler*, 272 U.S. 365.

Hemos revisado las decisiones y los criterios de los tratadistas sobre el particular, y creemos que puede afirmarse, sin temor a equivocación, que la doctrina sienta el principio no cuestionable de que la aprobación de un Mapa Oficial de vías públicas no constituye una expropiación forzosa de la propiedad por el solo hecho de tal aprobación, ni hay incautación de la propiedad por el Estado a la fecha de su aprobación.

En lo que ha habido considerable litigación y expresión de criterio es en cuanto a si las restricciones que un Mapa Oficial impone sobre la propiedad son de tal naturaleza irrazonables o confiscatorias en una determinada situación y circunstancia, que amerite que las cortes declaren que ha habido una expropiación sin pago. Nuestra propia Reglamentación de la Junta concibe que pueden surgir tales situaciones, y trata de dar un remedio en casos meritorios.

De ordinario, las cortes han resuelto ante esas situaciones, que no ha habido expropiación o confiscación sin compensación justa, sino el ejercicio del *poder de policía*, salvo aquellos casos verdaderamente extremos. Aun en tales casos extremos, el remedio no ha tenido que ser únicamente la expropiación. Pueden haber otros, como el eliminar las restricciones o reducirlas a un plano de razonabilidad. Pero como expresamos antes, ese problema no está ante nos en esta cuestión litigiosa.

La Sala asimiló este caso a la situación conocida en la jurisprudencia de los Estados norteamericanos como una ex-

propiación sin incautación. Usando el mismo término descriptivo que usó la Sala, un *"Non Physical Taking"*, y concluyó que "el *'Non Physical Taking'* de la franja objeto de esta acción ocurrió y tuvo efecto el 8 de junio de 1948."

No nos parece que el caso de autos, a la luz de la Ley y Reglamentos aplicables y de sus hechos, pueda estar gobernado por esa teoría. La situación característica de una expropiación "sin incautación física" la ofrecen *United States* v. *Causby*, 328 U.S. 256 y *Armstrong* v. *United States*, 364 U.S. 40, y casos ahí citados.[2]

El Procurador General invoca con énfasis en su discusión del problema aquí planteado nuestra decisión en *E.L.A.* v. *Rosso*, 95 D.P.R. 501 (1967), y pretende asimilar ambas situaciones. La decisión de *Rosso*, que se ha caracterizado como el uso del poder de expropiación forzosa para la creación de un "Banco de Tierras"[3] no envuelve el problema de la justa compensación constitucional por la propiedad expropiada. Por el contrario, si algo queda claramente reafirmado

---

[2] En el caso de *Causby*, el Gobierno Federal arrendó un aeropuerto municipal para el despegue y arribo de aviones militares. La altura segura para volar en ese sitio era de 83 pies, directamente sobre la finca de un propietario dedicada a criar aves, y los aviones volaban a 67 pies sobre el techo de la residencia, 63 pies sobre el granero y a 18 pies sobre la copa del árbol más alto. Se usaba el aeropuerto 11% del tiempo en despegar y aterrizar. Ello causaba grandes molestias a las personas con el ruido y las luces, y destruía el negocio de crianza de aves.

En esas circunstancias se resolvió que el Gobierno mantenía una servidumbre sobre la finca, compensable dicha servidumbre bajo la Enmienda Quinta.

En *Armstrong*, se resolvió que al hacerse cargo el Gobierno Federal para terminar la construcción de ciertos barcos que contrató construir una entidad privada, desaparecía un gravamen (*lien*) que los suplidores de material tenían a su favor bajo la ley estatal, al no poderse ejecutar dicho gravamen contra el Gobierno. El Tribunal Supremo decidió que ese gravamen tenía un valor de propiedad, compensable bajo la Quinta Enmienda. Véanse otros ejemplos citados en estos casos.

[3] David L. Callies, *"Commonwealth of Puerto Rico v. Rosso. Land Banking and the Expanded Concept of Public Use."* Prospectus—A Journal of Law Reform, Vol. II, No. 1, dic. 1968, University of Michigan Law School.

en *Rosso* es el principio que, si bien la determinación de lo que es una necesidad o interés público o social corresponde a la Legislatura con entera preferencia al Poder Judicial, salvo en una que otra situación irreal, la función de fijar la justa compensación por el uso de la propiedad privada para fines públicos o sociales es de la exclusiva competencia de los tribunales, por ser la "justa compensación" un concepto constitucional, no legislativo.(⁴)

No tenemos que elaborar la doctrina, ya axiomática, que la justa compensación constitucional se fija a la fecha de la incautación del título propietario por el Estado, y se fija a base de ciertos factores bien conocidos en la norma de Derecho, factores éstos que no están aquí en litigio. *Pueblo* v. *Carmona*, 70 D.P.R. 312 (1949); *Pueblo* v. *Huyke*, 70 D.P.R. 754 (1950); *Autoridad Sobre Hogares* v. *Sagastivelza*, 72 D.P.R. 276 (1951); *E.L.A.* v. *Fonalledas Córdova*, 84 D.P.R. 573 (1962).

—O—O—O—

Existen unas consideraciones adicionales.

De sostenerse la norma de compensación constitucional adoptada por la Sala sentenciadora, se crearía una situación aun más perjudicial para los dueños recurrentes.

La Sala fijó un valor al 8 de junio de 1948 de $66,913 para los 2,051.57 m/c, a razón de $16.00. A $16.00, estos 2,051.57 m/c fueron compensados en $32,825.12. La diferencia de $34,087.88 hasta el monto concedido de $66,913, representan intereses al 6% anual sobre $32,825.12 desde el 8 de junio de 1948 hasta el 30 de septiembre de 1965, en que ocurrió la incautación del título.

Dispone la Constitución del Estado Libre Asociado de Puerto Rico que sólo se dispondrá de fondos públicos, en

---

(⁴) Constitución del Estado Libre Asociado de Puerto Rico, Art. II, Sec. 9.

todo caso por autoridad de ley. La Ley de 14 de marzo de 1907, según ha sido enmendada—3 L.P.R.A. sec. 255—dispone que no se harán desembolsos de dineros públicos o fondos del Estado Libre Asociado de Puerto Rico, sino en virtud de libramientos expedidos por el Secretario de Hacienda y refrendados por el Gobernador. El Art. 102 del Código Político dispone que el Secretario de Hacienda firmará y expedirá todos los libramientos para el pago de los fondos de la Tesorería Estadual "que estuvieren autorizados por la ley."

Hemos dicho en casos de expropiación que si bien el actor inicial es el Estado, la parte demandada de hecho se convierte en actora al litigarse un exceso de compensación sobre la depositada. Cf. *Pueblo* v. *García*, 66 D.P.R. 504, 508 (1946); *Martínez Rivera* v. *Tribunal Superior*, 85 D.P.R. 1 (1962). Así, son de estricto seguimiento las disposiciones de ley sustantivas referentes a toda compensación adicional que afecte al Estado.

La autoridad de ley, según el precepto constitucional y las leyes citadas, para ordenar el desembolso de fondos públicos por vía de *intereses* en casos de expropiación, surge de los Arts. 5(a) y 5(b) de la Ley de 12 de marzo de 1903, según enmendada, 32 L.P.R.A. secs. 2907 y 2908:

Sec. 2907:

"Tan pronto se radique tal declaración de adquisición y entrega y se haga el depósito en la corte, para beneficio y uso de la persona o personas naturales o jurídicas que tengan derecho al mismo, de la cantidad estimada como compensación y especificada en la declaración, el título absoluto de dominio de dicha propiedad, o cualquier derecho o interés menor en la misma según quede especificado en la declaración, quedará investido en el Estado Libre Asociado de Puerto Rico o Gobierno Estadual, o en la agencia o instrumentalidad del Estado Libre Asociado de Puerto Rico que hubiere requerido la expropiación, o en el de la entidad demandante o peticionaria que no fuere el Estado Libre Asociado de Puerto Rico, y tal propiedad deberá considerarse como expropiada y adquirida para

el uso del Estado Libre Asociado de Puerto Rico o Gobierno Estadual, o de la agencia o instrumentalidad gubernativa del Estado Libre Asociado de Puerto Rico que hubiere requerido la expropiación, o de la correspondiente Autoridad de Hogares, o del municipio en cuestión o del Gobierno de la Capital, según fuere el caso, y el derecho a justa compensación por la misma quedará investido en la persona o personas a quienes corresponda; y dicha compensación deberá determinarse y adjudicarse en dicho procedimiento, y decretarse por la sentencia que recaiga en el mismo, *debiendo la sentencia incluir, como parte de la justa compensación concedida, intereses al tipo anual de seis (6) por ciento sobre la cantidad finalmente concedida como valor de la propiedad a contar desde la fecha de la adquisición, y desde dicha fecha hasta la fecha del pago; pero los intereses no deberán concederse sobre aquella parte de dicha cantidad que haya sido depositada y pagada en la corte.* Ninguna cantidad así depositada y pagada estará sujeta a cargo alguno por concepto de comisión, depósito o custodia." (Bastardillas nuestras.)

Sec. 2908:

"En cualquier sentencia dictada en un procedimiento de expropiación forzosa para la adquisición de propiedad privada o de cualquier derecho sobre la misma para uso público o aprovechamiento en beneficio de la comunidad, entablado por el Estado Libre Asociado de Puerto Rico o Gobierno Estadual directamente, o a su nombre por cualquier agencia, autoridad, instrumentalidad o funcionario del Estado Libre Asociado de Puerto Rico, en que la cantidad determinada por la corte como justa compensación por la propiedad o los derechos en la misma objeto de tal procedimiento, tanto en caso de trasmisión del título como de la mera posesión sin trasmisión del título, sea mayor que la cantidad fijada por el demandante y depositada en corte como justa compensación por tal propiedad o derechos en la misma, el Estado Libre Asociado de Puerto Rico pagará el importe de la diferencia entre la suma así fijada por el demandante y depositada por él en la corte y la cantidad que a tal efecto haya determinado la corte como justa compensación por dicha propiedad o derechos en las mismas objeto de tal procedimiento, *con intereses a razón de seis por ciento anual sobre tal diferencia a contar desde la fecha de la adquisición de tal propiedad o derechos y desde esta fecha hasta la del*

*pago de dicha diferencia;* Disponiéndose, que en los casos en que el demandado o demandados apelen de la sentencia fijando la compensación y el Tribunal Supremo confirmase dicha sentencia o rebajase la compensación concedida, *el apelante no recobrará intereses por el período de tiempo comprendido entre la fecha de radicación del escrito de apelación y hasta que la sentencia del Tribunal Supremo fuera final, firme y ejecutoria.*

Tan pronto la sentencia referida en el párrafo anterior sea final e inapelable, el Secretario de Hacienda de Puerto Rico pagará al demandado en dicho procedimiento. de expropiación el importe de la diferencia que se especifica en el párrafo anterior, *con intereses sobre la misma,* tal como allí se dispone; y el Secretario de Hacienda de Puerto Rico procederá a pagar *tal diferencia y los intereses sobre la misma,* como se dispone en esta sección, con cargo a cualesquiera fondos existentes en la Tesorería Estadual no destinados a otras atenciones.

Para el pago total de la diferencia mencionada en los párrafos anteriores y los intereses sobre la misma, como aquí se dispone, se compromete irrevocablemente la buena fe del Estado Libre Asociado de Puerto Rico." (Bastardillas nuestras.)

■ No hay facultad en ley para imponer intereses cubriendo período alguno *anterior* a la "fecha de la adquisición", en este caso Septiembre 30, 1965, ni para cubrir cantidad que no sea la diferencia entre el depósito hecho y la adjudicación final de valor, sujeto a los ajustes de los propios Arts. 5(a) y 5(b). Además, habiéndose fijado intereses desde 1948 a 1965 como parte del valor compensable de los 2,051.57 m/c, al fijarse los intereses autorizados sobre la diferencia entre el depósito y el valor de la propiedad finalmente determinado, los intereses serían parcialmente compuestos, no autorizados tampoco por la ley.

Por los fundamentos expresados, *se revocará la sentencia recurrida en tanto fijó una justa compensación a 2,051.57 m/c de los 5,914.97 m/c expropiados a base del valor al 8 de junio de 1948, y se dictará otra fijando la justa compensación a base del valor al 30 de septiembre de 1965, fecha de la incautación del título. Apareciendo que no hay controversia*

*en el valor de la propiedad a esta fecha, a razón de $70.00
el metro cuadrado, y habiéndose fijado un valor menor a los
referidos 2,051.57 m/c sólo en consecuencia de la norma de
derecho aplicada, que no prevalece, se fijará a éstos en la
sentencia igual valor de $70.00.*

El Juez Presidente Señor Negrón Fernández y los Jueces
Asociados Señores Rigau, Dávila y Torres Rigual, no inter-
vinieron.